John DILLARD, et al., Plaintiffs,

v.

CRENSHAW COUNTY, etc., et al., Defendants.

Civ. A. No. 85–T–1332–N.

United States District Court, M.D. Alabama, N.D.

May 28, 1986.

Larry T. Menefee, James U. Blacksher, Wanda J. Cochran, Blacksher, Menefee & Stein, P.A., Mobile, Ala., Terry G. Davis, Seay & Davis, Montgomery, Ala., Deborah Fins, Julius L. Chambers, NAACP Legal Defense Fund, New York City, for plaintiffs.

Alton L. Turner, Turner & Jones, Luverne, Ala., for Crenshaw Co. defendants.

D.L. Martin, Moulton, Ala., and David R. Boyd, Balch & Bingham, Montgomery, Ala., for Lawrence Co. defendants Co and Clerk.

Edward Still, Reeves & Still, Birmingham, Ala., Reo Kirkland, Jr., Brewton, Ala., for plaintiffs.

Barry D. Vaughn, Proctor & Vaughan, Sylacauga, Ala., for Talladega Co. defendants.

Yetta G. Samford, Jr., Samford, Denson, Horsley, Pettey, Martin & Barrett, Opelika, Ala., for Lee Co. defendants.

W.O. Kirk, Jr., Carrollton, Ala., for Pickens Co. defendants.

Jack Floyd, Floyd, Keener & Cusimano, Gadsden, Ala., for Etowah Co. defendants.

J.G. Speake, Speake, Speake & Reich, Moulton, Ala., for Probate Judge Lawrence Co.

Warren Rowe, Rowe, Rowe & Sawyer, Enterprise, Ala., for Coffee Co. defendants.

Herbert D. Jones, Jr., H.R. Burnham, Burnham, Klinefelter, Halsey, Jones & Cater, Anniston, Ala., for Calhoun Co. defendants.

James W. Webb, Webb, Crumpton, McGregor, Schmaeling & Wilson, Montgomery, Ala., and Lee M. Otts, Otts & Moore, Brewton, Ala., for Escambia Co. defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

This lawsuit is a challenge to the at-large systems used to elect county commissioners in nine Alabama counties with significant black populations. The court understands that these counties are the last such counties that still use at-large systems not already the subjects of federal lawsuits.

The plaintiffs are a number of black citizens in the nine counties, and the defendants are the nine counties and a number of their officials. The plaintiffs have brought this lawsuit under section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.[1] The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. §§ 1331, 1343.

Since the filing of this lawsuit, the plaintiffs have entered into settlements with three of the nine counties. This lawsuit is now before the court on several motions filed by the plaintiffs and the six remaining counties and their officials. The significant issues raised by the motions are whether the plaintiffs are entitled to preliminary injunctive relief; whether the claims against three of the counties are barred by res judicata; whether the claims against five of the counties should be severed and transferred to another district; and whether plaintiff classes should be certified.

For reasons that follow, the court concludes that preliminary injunctive relief is warranted in part against five of the six counties; that a claim against one county is barred by res judicata; that the remaining claims against all six counties should be tried in this district; and that plaintiff classes should be certified.

## I. FACTUAL BACKGROUND

The six counties remaining in this lawsuit are Calhoun County, Coffee County, Etowah County, Lawrence County, Pickens County, and Talladega County.[2] They each have majority white populations and significant black populations, ranging from approximately 13% to 42%.[3]

Five of the six counties are each governed by a board of commissioners elected under at-large systems in both primary and general elections. Not all at-large systems are alike, however, and the ones used by the five counties have three structural features particularly relevant here. The first feature is obvious. A candidate for commissioner must run at-large, or county-wide, with all voters in the county allowed to vote for the candidate. The second feature is that a candidate must run for a numbered post or separate place. Each commissioner position carries a separate number, and each candidate qualifies for a specific number and place, with each voter allowed to vote for only one candidate in each place. The third feature is that a candidate must receive a majority of votes cast in the primary to win the nomination of a political party. If no candidate receives a majority of votes, a run-off primary election is held. The majority vote requirement does not apply to general elections.

1. The plaintiffs also premise this lawsuit on the fourteenth and fifteenth amendments to the U.S. Constitution by way of 42 U.S.C.A. § 1983. However, since it appears that the reach of the section 2 claims in this lawsuit equals or exceeds that of the claims based on the two constitutional amendments, the court does not reach the plaintiffs' constitutional claims at this time. Prudent jurisdictional principles counsel that a court should normally "not decide a constitutional question if there is some other ground upon which to dispose of the case." *Escambia County v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984). *See also Lee County Branch of NAACP v. City of Opelika*, 748 F.2d 1473, 1478 (11th Cir.1984).

2. The three counties that settled are Crenshaw County, Escambia County, and Lee County.

3. According to the 1980 census, the black population of each county is as follows:

| County | Total Population | Black Population | Percent Black Population |
| --- | --- | --- | --- |
| Calhoun | 119,761 | 21,074 | 17.60% |
| Coffee | 38,533 | 6,532 | 16.95% |
| Etowah | 103,057 | 13,809 | 13.40% |
| Lawrence | 30,170 | 5,074 | 16.82% |
| Pickens | 21,481 | 8,978 | 41.80% |
| Talladega | 73,826 | 22,745 | 30.81% |

The sixth county, Pickens County, is also governed by a board of commissioners, but the commissioners are elected under a "dual system." Primary elections are held from four "single-member" districts, with the voters in each district restricted to voting only for candidates for the commissioner representing that district; whereas, general elections are conducted at-large in the same manner the other five counties conduct their general elections for commissioners.

The six counties have a clear history of racially polarized elections for both state and county officials, and no black person has ever been elected commissioner under the at-large systems used by the counties.

## II. LEGAL BACKGROUND

It is now generally undisputed that, where there is a history of elections polarized along racial or other group lines, at-large systems containing features similar to three described above tend "to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district." *Rogers v. Lodge*, 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (emphasis in original). By contrast, a minority might be able to elect one or more representatives, even in an at-large system, if the election is by a plurality without numbered places. For example, a black candidate could have a fair opportunity to be elected by a plurality of the vote if the black voters concentrate their vote behind one candidate or a limited number of candidates, while the white voters divide theirs among a number of candidates. *City of Rome v. United States*, 446 U.S. 156, 183–84 & n. 19, 100

S.Ct. 1548, 1565 & n. 19, 64 L.Ed.2d 119 (1980). *See also Rogers*, 458 U.S. at 627, 102 S.Ct. at 3280 ("the requirement that candidates run for specific seats ... enhances [black voters'] lack of access [to the political system] because it prevents a cohesive group from concentrating on a single candidate"); H.R.Rep. No. 227, 97th Cong., 1st Sess. 18 ("discriminatory elements of the elections process ... [include] numbered posts....") Similarly, a minority might be able to elect one or more representatives if, first, the political unit were divided into single-member districts, with the voters in each district restricted to voting only for candidates for the commissioner representing that district; and, second, one or more districts had a sufficient number of black voters to elect a black candidate. *Rogers*, 458 U.S. at 616, 102 S.Ct. at 3275.

Nevertheless, the Supreme Court has held that, even though such at-large systems have a "winner-take-all" aspect and a "tendency to submerge minorities and to overrepresent the winning party," *Whitcomb v. Chavis*, 403 U.S. 124, 158–159, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363 (1971), they are not illegal *per se*. *Rogers*, 458 U.S. at 616–17, 102 S.Ct. at 3275.

The plaintiffs claim that the at-large election systems used in the six counties violate section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973. A violation of section 2 as recently amended in 1982 is established if official action was taken or maintained with a racially discriminatory "intent" or the action has racially discriminatory "results," determined according to certain Congressionally approved criteria.[4] *McMillan v. Escambia*

4. In order to make out a results claim under section 2, the plaintiffs must show that "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2nd Sess. 28, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 206. Factors typically considered in evaluating such a claim are:

　　1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of

the minority group to register, to vote, or otherwise to participate in the democratic process;

　　2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

　　3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportu-

**1354**

County (Escambia II), 748 F.2d 1037, 1046 (5th Cir.1984) (Former Fifth); *Buskey v. Oliver*, 565 F.Supp. 1473, 1481 & n. 18 (M.D. Ala.1983). In this case, the plaintiffs contend both that the at-large systems used by the six counties were created with a racially discriminatory intent and that the systems have racially discriminatory results. They have, however, informed the counties and the court that they intend to pursue their intent claims first and that they will pursue a results claim against a county only if their intent claim against the county fails.

## III. PRELIMINARY INJUNCTION

■ The plaintiffs request preliminary injunctive relief against continued use of at-large systems in the six counties. Adhering to their announced trial strategy, they limit the premise of their request to their section 2 intent claims.

To obtain a preliminary injunction, the plaintiffs must show that "(1) there is a substantial likelihood that they will prevail on the merits at trial; (2) they will suffer irreparable harm if they are not granted the injunctive relief; (3) the benefits the injunction will provide them outweigh the harm it will cause the [defendants]; and (4) the issuance of the injunction will not harm public interests." *Callaway v. Block*, 763 F.2d 1283, 1287 (11th Cir.1985). The plaintiffs have met these requirements as to all defendant counties except Pickens County. Pickens County's affirmative defense of res judicata precludes preliminary relief, as the court explains in part IV of this opinion.

### A. Likelihood of Success

There are, at least, two methods of establishing a section 2 intent claim. The plaintiffs have shown a substantial likelihood of success under both methods.

#### i.

One method by which a plaintiff may establish a prima facie case of discriminatory intent under section 2 is by showing, first, that racial discrimination was a "substantial" or "motivating" factor behind the enactment or maintenance of the electoral system and, second, that the system continues today to have some adverse racial impact.[5] *Hunter v. Underwood*, 471 U.S. 222, ——, 105 S.Ct. 1916, 1920, 1923, 85 L.Ed.2d 222 (1985) (Alabama constitutional provision disenfranchising persons convict-

---

nity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 28–29, 1982 U.S. Code Cong. & Ad. News at 206–207. There is no requirement that any particular one of these factors or number of these factors be proved; rather, the court's concern should be the "totality of the circumstances." Id. at 207 & n. 118. *See also White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

5. The discriminatory results needed to establish a section 2 violation in the absence of intentional discrimination should not be confused with the present day adverse racial impact needed to establish a section 2 intent claim. The former is more a term of art, established according to certain Congressionally approved criteria described in footnote 4, *supra;* whereas, the latter is less stringent and may be met by any evidence that the challenged action is having significant adverse impact on black persons today. *See* Note, *The Constitutional Significance of the Discriminatory Effects of At-large Elections*, 91 Yale L.J. 974 (1982).

ed of crimes of moral turpitude was enacted for racially discriminatory purpose and continues to have adverse racial impact in violation of the fourteenth amendment); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (city did not deny rezoning for reasons of race in violation of the fourteenth amendment); *NAACP v. Gadsden County School Board*, 691 F.2d 978, 981 (11th Cir.1982) (at-large election system for school board members was adopted for racially discriminatory purpose and continues to have adverse racial impact in violation of the fourteenth amendment). *See also* Note, *The Constitutional Significance of the Discriminatory Effects of At-large Elections*, 91 Yale L.J. 974, 976–77 (1982). If the plaintiff establishes these two elements, the burden then shifts to the scheme's defenders to demonstrate that the scheme would have been enacted without the purposefully discriminatory factor. *Hunter*, 471 U.S. at 228, 105 S.Ct. at 1920. *See also Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Of course, in proving discriminatory intent under section 2 a plaintiff is not restricted to direct evidence, *Rogers*, 458 U.S. at 618, 102 S.Ct. at 3276; rather, "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Id., quoting Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564.

Furthermore, that the plaintiffs in this section 2 claim have placed on this court the task of looking behind legislative action is not an impediment. Admittedly, democratic principles teach that courts should ordinarily defer to decisions of legislative or administrative bodies about governmental goals and the means for achieving those goals. However, race discrimination is a forbidden consideration whose presence in the legislative or administrative process taints the process. The usual judicial deference thus does not obtain where a plaintiff charges in a section 2 claim that invid-

ious race discrimination was a substantial or motivating consideration in the legislative or administrative process. As the Supreme Court explained in *Arlington Heights*, "racial discrimination is not just another competing consideration. Where there is proof that a discriminatory purpose has been a motivating factor in the [legislative or administrative] decision, this judicial deference is no longer justified." 429 U.S. at 265–66, 97 S.Ct. at 563.

■ For these same reasons, a plaintiff asserting a section 2 intent claim need not meet a more exacting standard of proof merely because legislative or administrative action is challenged. As the Supreme Court observed in *Arlington Heights*, the law "does not require a plaintiff to prove that the challenged [legislative or administrative] action rested solely on racially discriminatory purposes," or even that such purposes were "dominant" or "primary." 429 U.S. at 265, 97 S.Ct. at 563. The plaintiff need establish only that the forbidden consideration of race discrimination was a substantial or motivating factor before the burden of salvaging the challenged legislative or administrative action shifts to the defenders of the action. *Id.; Hunter, supra.* As the Court observed, "[l]egislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute." *Arlington Heights*, 429 U.S. at 265 n. 11, 97 S.Ct. at 563 n. 11, *quoting McGinnis v. Royster*, 410 U.S. 263, 276–77, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973).

■ Admittedly, the court has cited and relied upon such fourteenth amendment cases as *Hunter, Rogers, Arlington Heights,* and *NAACP* in describing how a plaintiff may establish a section 2 intent claim. However, the legislative history of the 1982 amendments to section 2 clearly indicates that the 1982 amendments derive from the fourteenth amendment as well as the fifteenth amendment. S.Rep. No. 417, 97th Cong. 2d. Sess. 39, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 217;

H.R.Rep. No. 227, 97th Cong., 1st Sess. 31. Accordingly, it is appropriate that the manner for establishing a section 2 intent claim should be along the same lines as that for establishing intent under the fourteenth amendment. *See Escambia II*, 748 F.2d at 1046 ("this court already has determined that the at-large election system was maintained for a discriminatory purpose and thus violated the fourteenth amendment. ... This showing of intent is sufficient to constitute a violation of section 2").

With the preceding principles in mind, the court is firmly convinced that the plaintiffs have more than adequately shouldered the first requirement for a preliminary injunction against Calhoun County, Coffee County, Etowah County, Lawrence County, and Talladega County; the plaintiffs have shown a clear and substantial likelihood of prevailing on their section 2 intent claims. First, the court is convinced that in the 1960's the State of Alabama enacted numbered place laws with the specific intent of making local at-large systems, including those used in county commission elections, more effective and efficient tools for keeping black voters from electing black candidates. Second, the court is convinced that the at-large systems, as modified in the 1960's and used today by the five counties, are still having their intended racist impact. The court is also convinced that the five counties have failed to meet their burden of showing that the numbered place laws would have been enacted without the discriminatory purpose. The evidentiary basis for these conclusions is as follows.

The testimony and opinions of a well-respected historian, Dr. Peyton McCrary, established that in the 1960's, to meet the growing threat of black voters and possible black officeholders, the Alabama legislature refashioned the at-large electoral systems then in use in many counties and cities throughout the state. The discriminatory centerpiece of the new at-large systems was the numbered place laws.

According to the historian, the state was openly and unabashedly intent on finding new strategies to keep black persons out of the electoral process in the wake of the Supreme Court's 1944 ban of all-white primaries in *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). Since the winner of a Democratic primary in Alabama was virtually guaranteed a victory in the general election, the all-white primary had been an effective state-wide method of denying black persons a meaningful opportunity to participate in the election process.

In response to the judicial ban on all-white primaries, the Alabama legislature passed a bill in the 1950's outlawing single-shot voting in municipal elections conducted at-large. Single-shot voting generally "enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *City of Rome*, 446 U.S. at 184 n. 19, 100 S.Ct. at 1565 n. 19, *quoting U.S. Commission on Civil Rights*, "The Voting Rights Act: Ten Years After," pp. 206–07 (1975). Single-shot voting has been described as follows:

Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting.

*City of Rome v. United States, supra.* A law banning single-shot voting generally requires that each elector cast votes for as many candidates as there are positions. *See, e.g., Nevett v. Sides*, 571 F.2d 209, 217 n. 10 (5th Cir.1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). Such a law seriously disadvantages minority voters "because it may force them to vote for nonminority candidates, thus depreciating the relative position of minority candidates." *Id.*

State Representative Sam Englehart of Macon County, Alabama was the sponsor of the state laws banning single-shot voting. Englehart was the founder of the racist White Citizens Council Movement of the 1950's and was a notorious segregationist. Englehart was also the author of the infamous, racially inspired Tuskegee gerrymander struck down by the federal courts in the 1960's. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (holding that a constitutional challenge to the Tuskegee gerrymander could be entertained by the federal courts.) The racial purpose behind the laws banning single-shot voting was not kept secret. Englehart's father-in-law, then a state senator, explained to a newspaper that the legislature had passed the laws because "there are some who fear that the colored voters might be able to elect one of their own race to the [Tuskegee] city council by 'single shot' voting." For the same racial reasons, the ban on single-shot voting was extended in the late 1950's to cover at-large primary elections for county commissioners.

The laws banning single-shot voting were repealed in 1961 and replaced with laws requiring that candidates run for numbered places in all state, county and municipal at-large elections, both primary and general. The numbered place laws had the same effect on black voting strength in at-large elections as the laws banning single-shot voting, and there can be no doubt that they sprang from the same motivation. Shortly after the enactment of numbered place laws, at a meeting of the State Democratic Executive Committee with Englehart presiding, a committee member explained the state legislature's open and unabashed racist motive behind the new numbered place laws and the significant role the laws were to play in keeping black voters from electing black persons in the primary elections to be conducted by the Committee:

"[W]e have got a situation in Alabama that we are becoming more painfully aware of every passing day, that we have a concerted desire and a campaign to register Negroes en masse, regardless of the fact that many of them ordinarily cannot qualify because of their criminal records, or criminal attitudes, because of the fact that they are illiterate and cannot understand or pass literacy tests.... [I]t has occurred to a great many people, including the legislature of Alabama, that to protect the white people of Alabama, that there should be numbered place laws."

These racially inspired numbered place laws exist and operate today.

Therefore, regardless of the reasons for which the at-large systems were put into place in various counties, including the five counties sued here, the numbered place laws have inevitably tainted these systems wherever they exist in the state. In adopting the laws, the state reshaped at-large systems into more secure mechanisms for discrimination. And as the evidence makes clear, this reshaping of the systems was completely intentional.

This evidence adequately supports the conclusion that the at-large systems now being used in the five counties are a product of intentional discrimination. Nevertheless, any remaining doubt that the systems were racially inspired is dispelled by further evidence that the systems were created in the midst of the state's unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave. *See Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564 ("the historical background of the [challenged] decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes"); *Ammons v. Dade City*, 783 F.2d 982, 988 (11th Cir.1986) ("a large body of constitutional jurisprudence ... recognizes that the historical context of a challenged activity may constitute relevant evidence of intentional discrimination").

The plaintiffs have presented considerable evidence demonstrating that the state has an extensive history of discriminating against black persons in the area of voting

rights and specifically by using at-large systems. The plaintiffs' historical presentation began with evidence dating from Alabama's so-called "redemption" by the white-supremacist Democratic party around 1870. In the late 1860's, the Republicans temporarily gained control in Alabama and were able both to author a new constitution that provided for universal suffrage and to have a significant voice in the state legislature. In 1870, however, the Democratic party, which openly and vigorously promoted white supremacy, won the governorship and control of the house, and, in 1874, the Democrats regained complete control of the state government.

Following this "redemption" by the white-supremacist Democratic party, the state legislature passed a series of local laws that eliminated elections for county commission and instead gave the governor the power to appoint the commissioners. This system of gubernatorial appointment was particularly favored in black belt counties threatened with black voting majorities. According to the plaintiffs' historian, the gubernatorial appointment system is widely understood to have been designed to prevent the election of black county commissioners.

The rise of the Populist movement in the 1890's triggered new changes in Alabama's election laws. Since the Populist movement had considerable support among black persons and poor white persons, steps had to be taken to prevent these two groups from joining together in potentially powerful coalitions. In 1893, the legislature passed a complex election statute known as the Sayre Law, "[t]he express purpose of [which], according to its author, was to legally eliminate the Negro from politics in Alabama." *Bolden v. City of Mobile*, 542 F.Supp. 1050, 1062 (S.D.Ala. 1982). The Sayre Law apparently had its desired effect, for black voter turnout dropped by 22% from 1892 to 1894 and thereafter remained below 50%. *Id.* at 1062. The Populist movement not only inspired the Sayre Law, it also set off the first of several shifts between single-member district and at-large elections for coun-

ty commissioners. The plaintiffs' historian testified that because at-large elections have the effect of diluting the black vote, they are particularly favored when black persons' right to vote is relatively unfettered and black voters stand a chance of electing a candidate of their choice; when black persons' access to the ballot box is circumscribed, on the other hand, single-member districts gain in popularity. In 1894, when the Populist movement had just reached its peak and black persons were still able to vote fairly freely, numerous counties moved from single-member districts to at-large elections, apparently in order to undermine possible coalitions between black persons and poor white persons.

This trend toward at-large elections reversed itself after the 1901 Constitutional Convention. There can be little question but that a major purpose of the 1901 Convention was to disenfranchise black persons. As the Supreme Court recently commented in another case, expert testimony "showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. ... The delegates to the all-white convention were not secretive about their purpose." *Hunter v. Underwood*, 471 U.S. 222, 229, 105 S.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985). The 1901 Constitution contained so many different voter qualifications that by 1909 all but approximately 4,000 of the nearly 182,000 black persons of voting age in Alabama had been removed from the rolls of eligible voters. *Bolden*, 542 F.Supp. at 1063 & n. 10. After the 1901 Convention, counties increasingly moved toward single-member districts; since most black persons could no longer vote, the use of single-member districts was obviously fairly "safe." In fact, the legislature was so confident that black persons had been removed as a political force that in 1907 it passed a law providing for single-member district elections of aldermen in all cities in the state. *Id.* at 1063.

A final shift back towards at-large elections began in 1944. According to the plaintiffs' historian, in response to both the Supreme Court's ban of all-white primaries and the Civil Rights Acts of 1957, 1964, and 1965, many counties shifted back to at-large elections. This shift was in substantial measure parallel with the legislature's racially inspired decisions to refashion at-large systems to prohibit single-shot voting and later to require numbered places.

Again, state legislators were often open and unashamed of their intent. For example, State Senator Clark, who introduced a bill in 1965 to shift elections in Barbour County, Alabama from single-member districts to an at-large system, explained to a local newspaper that "a further consideration in introducing this bill would be to lessen the impact of any bloc vote in any district which has a relatively small number of eligible voters"; the term "bloc vote" was commonly used at that time as a code to refer to the black vote. According to another local newspaper, supporters of a similar bill for Choctaw County, Alabama "advocate the change because of the increasing number of Negro voters that have been qualified in recent weeks.... They maintain that by electing the [county] commissioners on an at-large basis the threat of an effective Negro bloc vote will be eliminated." [6] Since black voters once again posed a threat to total control of the electoral process by white persons, single-member districts were abandoned and at-large systems were put into place.

In addition to implementing and maintaining at-large elections, reinforced by laws banning single-shot voting and laws requiring numbered places, the state passed a number of other statutes designed to discriminate against black voters. For example, starting shortly after the all-white primaries were struck down, the state passed a series of laws requiring black persons who wished to register to vote to satisfy different and more stringent standards and tests than white persons. *See, e.g., United States v. Parker*, 236 F.Supp. 511 (M.D.Ala.1964); *United States v. Penton*, 212 F.Supp. 193 (M.D.Ala.1962); *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.), aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949). Other barriers placed in the way of black voters after 1944 include racial gerrymandering, *Sims v. Baggett*, 247 F.Supp. 96 (M.D.Ala.1965), discriminatory administration of the poll tax, *United States v. Alabama*, 252 F.Supp. 95 (M.D. Ala.1966), and appointment of disproportionately few black poll officials. *Harris v. Graddick (Harris II)*, 601 F.Supp. 70 (1984); *Harris v. Graddick (Harris I)*, 593 F.Supp. 128 (M.D.Ala.1984).

These efforts to keep black persons from voting and being elected to office paralleled and complemented the state's efforts to discriminate against black persons in all other areas of their lives. As children, black persons were required to go to segregated schools, *see, e.g., Lee v. Macon County Bd. of Ed.*, 231 F.Supp. 743 (M.D. Ala.1964) (three-judge court), play in segregated parks, *Gilmore v. City of Montgomery*, 176 F.Supp. 776 (M.D.Ala.1959), modified, 277 F.2d 364 (5th Cir.1960), and use segregated recreational facilities. *Smith v. Y.M.C.A.*, 316 F.Supp. 899 (M.D.Ala. 1970), aff'd as modified, 462 F.2d 634 (5th Cir.1972). As they grew up, black persons faced continued discrimination in education, *United States v. Alabama*, 628 F.Supp. 1137 (N.D.Ala.1985), and were also discriminated against in state employment, *see, e.g., Paradise v. Prescott*, 585 F.Supp. 72 (M.D.Ala.1983), aff'd, 767 F.2d 1514 (11th Cir.1985) (racial discrimination in promotion of state troopers); *NAACP v. Allen*, 340 F.Supp. 703 (M.D.Ala.1972), aff'd, 493 F.2d 614 (5th Cir.1974) (racial discrimination in hiring of state troopers); *United States v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.1970) (four departments of Alabama state government with a total of approximately 3,000 employees engaged in pattern or practice of employment discrimination

---

**6.** Although the Choctaw County voters defeated the proposed change in a local referendum for reasons unrelated to race, this evidence makes clear that there was widespread understanding that at-large elections have an adverse impact on the black vote.

against blacks); *Marable v. Alabama Mental Health Board,* 297 F.Supp. 291 (M.D. Ala.1969) (three-judge court) (state mental health board discriminated against black employees), cultural opportunities, *Cobb v. Montgomery Library Board,* 207 F.Supp. 880 (M.D.Ala.1962) (blacks excluded from public library and museum), and even their private lives. *United States v. Brittain,* 319 F.Supp. 1058 (N.D.Ala.1970) (miscegenation laws).

Furthermore, no matter what form of public transportation they chose, black persons were subjected to segregation. *See, e.g., United States v. City of Montgomery,* 201 F.Supp. 590 (M.D.Ala.1962) (state-imposed segregation in municipal airport facilities); *Lewis v. Greyhound Corp.,* 199 F.Supp. 210 (M.D.Ala.1961) (state policy of maintaining segregated bus terminals); *Browder v. Gayle,* 142 F.Supp. 707 (M.D. Ala.) (three-judge court), *aff'd mem.,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (segregated city buses required by state statute and city ordinance). Black mental patients were placed in segregated and inferior public hospitals, *Marable,* 297 F.Supp. at 294, and black persons were discriminated against on both sides of the legal system; they were routinely excluded from juries, *see, e.g., Black v. Curb,* 464 F.2d 165 (5th Cir.1972), and they were kept in segregated quarters in the state's jails and prisons. *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966) (three-judge court), *aff'd,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1967).

As the late Judge Richard T. Rives stated, "from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society." *United States v. Alabama,* 252 F.Supp. 95, 101 (M.D.Ala. 1966) (three-judge court).

On this extensive historical record based on both direct and circumstantial evidence, the conclusion is inescapable that in the 1960's the state superimposed numbered place requirements on all at-large systems with the specific intent of discriminating against black persons. The state's adoption of numbered place laws as a means of discrimination was also entirely consistent with its longstanding history of discrimination. From the late 1800's through the present, the state has consistently erected barriers to keep black persons from full and equal participation in the social, economic, and political life of the state.

The plaintiffs have therefore established a substantial likelihood of prevailing on their section 2 intent claims against Calhoun County, Coffee County, Etowah County, Lawrence County, and Talladega County. The plaintiffs have met all requirements for such claims. First, in the 1960's, the State of Alabama passed numbered place laws with the specific intent of making at-large election systems more effective and efficient instruments for keeping black voters from electing black candidates. Second, these systems, as redesigned, are still having their intended racist impact. In the racially polarized political atmosphere of the five counties, black voters are still unable to elect black candidates to commission seats because of the systems. And third, the five counties have failed to show that the numbered place laws would have been enacted in the absence of the discriminatory intent behind them.

ii.

As the court stated earlier, there are, at least, two methods of establishing a claim of intentional discrimination under section 2. The second method is based primarily on the evidentiary concept of pattern and practice.

██ Again borrowing from fourteenth amendment law and similar law, a plaintiff may establish a prima facie case of intentional discrimination by showing, first, that those responsible for the enactment or maintenance of the challenged electoral scheme have engaged in a pattern and practice of enacting and maintaining other, similar schemes for racially discriminatory reasons; and, second, that the challenged scheme has some present day adverse racial impact. The plaintiff need not show

that race discrimination was the sole reason for these other schemes; rather, the plaintiff need show only that race discrimination was a substantial or motivating factor behind these schemes. If the plaintiff establishes both these elements, the burden then shifts to the defenders of the challenged scheme to show either that the scheme was not a product of race discrimination or that, if it was, it would have been enacted or maintained even in the absence of the discriminatory purpose. *See Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973) (where plaintiffs show that school authorities have effectuated an intentionally segregative policy in a meaningful portion of the school system, the court may infer that similar impermissible considerations have motivated their actions in other areas of the school system, and burden shifts to the school authorities to show otherwise as to other areas); *see also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 362, 97 S.Ct. 1843, 1868, 52 L.Ed.2d 396 (1977) (where plaintiffs prove that employer engaged in a pattern and practice of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e through 2000e–17, burden then shifts to employer to show that individual applicant was denied employment for lawful reason); *Lee v. Washington County Board of Education,* 625 F.2d 1235, 1239 (5th Cir.1980) (once purposeful discrimination in hiring is proved against class in an employment discrimination action under 42 U.S.C.A. §§ 1981, 1983, burden then shifts to the employer to show that the individual members of class seeking relief would not have been hired absent the discrimination).[7]

■ The plaintiffs have shown a substantial likelihood of prevailing on this second method of establishing a section 2 intent claim, for they have established a prima facie case of race discrimination which the defendants have not rebutted. First, the preceding evidence shows that the Alabama legislature, which was responsible for the at-large systems in the five counties, has consistently enacted at-large systems for local governments during periods when there was a substantial threat of black participation in the political process. This evidence, set against the background of the state's unrelenting and undisputed history of race discrimination, convinces the court that the enactment of the at-large systems during such periods was not adventitious but rather racially inspired. The evidence therefore reflects that the legislature has engaged in a pattern and practice of using at-large systems as an instrument for race discrimination. Second, as already stated, the evidence shows that the at-large systems used by the five counties to elect commissioners have a present day adverse racial impact. Third, the counties have not at this time satisfactorily met their burden of refuting this prima facie case. The counties have not shown that their at-large systems were not a product of race discrimination, nor have they shown that their systems would have been enacted in the absence of race discrimination.

iii.

In light of these conclusions, the next issue the court must consider is what preliminary injunctive relief would be appropriate against the five counties. Four of the five counties are to elect one or more county commissioners this year. The primary elections are scheduled for June 3,

---

**7.** The plaintiffs contend that a plaintiff should not have the burden of establishing present day adverse racial impact, but rather that once the plaintiff establishes a pattern and practice of race discrimination the defenders of the challenged action should have the burden of establishing no present day adverse impact. The court disagrees. *See International Brotherhood of Teamsters,* 431 U.S. at 362, 97 S.Ct. at 1868 (to shift burden to employer with respect to individ- ual employees entitled to relief, plaintiffs in Title VII pattern and practice suit must "show that the alleged individual discriminatee unsuccessfully applied for a job"); *Keyes,* 413 U.S. at 208, 93 S.Ct. at 2697 (presumption of discriminatory intent based on evidence of segregative intent in one portion of a school system is created only with respect to "other segregated schools within the system").

1986, with runoff elections, if necessary, scheduled for June 24; and the general elections are to be held in November. The plaintiffs seek a preliminary injunction requiring the counties to implement single-member districts immediately and to postpone any primary and general elections for county commissioners until such time as the plans are implemented. In addition, the plaintiffs seek to shorten the terms of incumbents who are now scheduled to remain in office past the end of this year, and they seek to require Coffee County, the one county that does not have commission elections this year, to hold elections at the same time as the other four counties.

■■■ For several reasons, the court refuses to order the five counties to implement new election plans, including possibly single-member district plans, until after this lawsuit has been finally heard on the merits. First, while it is clear that the existing at-large systems are infirm, it is inappropriate at this time to order a single remedy for all of the counties. The court simply does not have sufficient evidence about the individual characteristics of each county. Second, even if it were clear that all of the counties should be required to adopt single-member districts, it would be unfair and infeasible to require them to do so by June. The plaintiffs did not even seek preliminary injunctive relief until February 1986 and were unable to produce all of the evidence necessary to consider the motion until late March, less than three months before the primaries are scheduled to begin. Finally, given that the plaintiffs' requested injunction goes well beyond merely preserving the status quo while the litigation is pending, the very nature of their request demands that the court proceed with caution. *See, e.g., Martin v. International Olympic Committee,* 740 F.2d 670, 675 (9th Cir.1984) ("[i]n cases ... in which a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite,* courts should be extremely cautious about issuing a preliminary injunction"); *Harris v. Wilters,* 596 F.2d 678, 680 (5th Cir.1979) ("[o]nly in rare instances is the issuance of

a mandatory preliminary injunction proper"); *Jordan v. Wolke,* 593 F.2d 772, 774 (7th Cir.1978) ("mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued").

■■■ While the court refuses to order the counties to implement new election plans in time for the June elections, the court does recognize that with each election the at-large systems impermissibly dilute the vote of thousands of black citizens and thus must be eliminated as soon as possible. The court will therefore set a trial date for mid-summer of this year and will enter a preliminary injunction requiring that, pending trial, each county must submit a time schedule for developing a new election plan, obtaining approval of the plan from the U.S. Department of Justice pursuant to section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c, and implementing the new plan. These schedules will be due 21 days from the date of this order and must provide that the development, approval, and implementation of the plans will all be completed by January 1, 1987.

■■■ The only question that remains is whether all scheduled elections should be postponed until such time as they may be conducted in accordance with the new plans. Many of the considerations leading the court to refuse to order immediate implementation of new plans also lead it to refuse to postpone the scheduled elections. Moreover, without having alternative election plans ready to be implemented immediately, the court is unwilling to enjoin the scheduled elections. Numerous unforeseen events could delay the implementation of alternative plans, ranging from disagreement over where district lines should be drawn to failure to get approval from the Department of Justice. Given that five different counties are involved and that the counties' election systems may all have to be completely reorganized, there can be no absolute assurance that new plans will be fully implemented before January 1987, when some of the present commissioners'

terms will end. The court does not wish to be left in the position of having either to extend the terms of incumbents or to appoint temporary replacements to serve until the new plans are in place. Both alternatives would effectively deny the entire electorate the right to vote and thus seem to offend basic principles of representative government.

The court cautions the counties, however, that they should not take the preceding statements as a suggestion that the court will easily entertain and grant extensions of the January 1 deadline. On the present record, the court fully expects that all five counties will develop new, nondiscriminatory election plans and hold elections under those plans by the first of next year.

**B.** *Irreparable Injury to the Plaintiffs*

The plaintiffs have clearly satisfied the second requirement for a preliminary injunction, which is that they will suffer irreparable harm unless they obtain immediate relief. An injury is irreparable "if it cannot be undone through monetary remedies." *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Nov. 13, 1981) (Unit B). The injury alleged here is denial of the right to vote. As the Supreme Court recognized long ago, the right to vote is " 'a fundamental political right, because preservative of all rights.' ... [E]ach and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." *Reynolds v. Sims,* 377 U.S. 533, 562, 565, 84 S.Ct. 1362, 1381, 1383, 12 L.Ed.2d 506 (1964) (citation omitted). Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance. *Cf. Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Therefore, as this court observed in *Harris I,* plaintiffs seeking preliminary injunctive relief under section 2 "should not

be and are not required to make the usual showing of irreparable injury as a prerequisite to relief; rather, such injury is presumed by law." 593 F.Supp. at 135.

**C.** *Relative Harms*

The court also concludes that the plaintiffs have met the third requirement for preliminary injunctive relief, which is that the benefits to the plaintiffs of preliminary injunctive relief outweigh any possible harm to the counties. To be sure, the relief imposed will inconvenience five of the counties in some measure, for the counties will have to proceed immediately with development of new plans. However, the administrative burden on the five counties cannot begin to compare with the further subjection of the counties' black citizens to denial of their right, to full and equal political participation, beyond January 1, 1987, the date by which the court believes the counties can reasonably implement new election plans. The latter alternative is morally as well as legally indefensible.

**D.** *Public Interest*

Finally, the plaintiffs have met the fourth requirement for preliminary injunctive relief. Without question, the public interest would not be harmed by the preliminary injunctive relief awarded today. Section 2, as amended, represents "a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process. Thus, when section 2 is violated the public as a whole suffers irreparable injury." *Harris I,* 593 F.Supp. at 135. The public interest, therefore, mandates the relief afforded by the court today.

## IV. RES JUDICATA

Three of the defendant counties—Coffee County, Pickens County, and Talladega County—maintain that all of the claims against them are due to be dismissed from this lawsuit on the grounds of res judicata. Coffee and Talladega Counties' defenses of res judicata lack merit completely. Pickens County's res judicata defense has merit, but in part only. The defense has merit as to the plaintiffs' sec-

tion 2 intent claim but not as to their section 2 results claim. Furthermore, as indicated earlier, Pickens County's defense prohibits the plaintiffs from securing preliminary injunctive relief against the county; this result obtains because the premise for the plaintiffs' preliminary injunctive request is limited to the barred claim.

### A. *Pickens County*

In *Nevada v. United States,* 463 U.S. 110, 129, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983), the Supreme Court explained that

> "the doctrine of *res judicata* provides that when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'... The final 'judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever.' "

In order for res judicata to apply, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits, the parties or those in privity with them must be identical in both suits, and the same cause of action must be involved in both suits. *Ray v. Tennessee Valley Authority,* 677 F.2d 818 (11th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983).

■ According to Pickens County, the question of whether Pickens County intentionally discriminated against black voters through the use of an at-large system for electing commissioners was decided in the *Corder v. Kirksey* litigation. *Corder v. Kirksey (Corder IV),* 688 F.2d 991 (5th Cir.1982) (per curiam) (Former Fifth), *cert. denied,* 460 U.S. 1013, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983); *Corder v. Kirksey (Corder III),* 639 F.2d 1191 (5th Cir.1981); *Corder v. Kirksey (Corder II),* 625 F.2d 520 (5th Cir.1980) (per curiam); *Corder v. Kirksey (Corder I),* 585 F.2d 708 (5th Cir. 1978). In *Corder,* black residents of Pickens County challenged the constitutionality of the at-large method of electing county commissioners and school board members; as the present plaintiffs apparently concede, the litigation focused on the question of racially discriminatory intent. After years of litigation, including several appeals, the appellate court finally affirmed the district court's finding that the plaintiffs had failed to prove discriminatory intent. *Corder IV, supra; Corder III, supra.*

The plaintiffs in the present action appear to concede that the prior suit against Pickens County resulted in a final judgment on the merits rendered by a court of competent jurisdiction and that the parties in the two suits were the same.[8] However, the plaintiffs argue that because they raise a *section 2* claim of intentional discrimination while the *Corder* plaintiffs raised a *constitutional* claim of intentional discrimination, the two suits simply do not involve the same cause of action.

■ The former Fifth Circuit recognized that "the principal test for comparing causes of action is whether the primary right and duty or wrong are the same in each action." *Kemp v. Birmingham News Co.,* 608 F.2d 1049, 1052 (5th Cir.1979). In this case, it is clear that the primary rights and duties are the same. Despite the nom-

---

**8.** The plaintiffs in *Corder* were the class of black residents of Pickens County; the plaintiffs here are the class of black citizens of Pickens County. There is obviously considerable overlap between the two classes. To the extent that any of the present plaintiffs were for some reason not members of the plaintiff class in *Corder,* they are nonetheless bound because their interests are so closely related to those of the *Corder* plaintiffs. "Under the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet-General Corporation v. Askew,* 511 F.2d 710, 719 (5th Cir.), *cert. denied,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975).

inal difference between the claim in *Corder* and that raised here, the plaintiffs in both suits were asserting the same right—namely, the right to be free from intentional racial discrimination. *See Nilsen v. City of Moss Point*, 701 F.2d 556 (5th Cir.1983) (en banc) (res judicata bars plaintiff's claims of sex discrimination in suit based on fourteenth amendment because she had previously brought same claims under Title VII). Furthermore, the Eleventh Circuit has more recently explained that the bar of res judicata "extends not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same 'operative nucleus of fact.'" *Olmstead v. Amoco Oil Co.*, 725 F.2d 627, 629 (11th Cir.1984). Since the plaintiffs in both suits challenged the same election system in the same county, it would appear that their claims did arise out of the identical "operative nucleus of fact." The principles of res judicata may therefore apply regardless of the fact that the plaintiffs in the first suit relied on the constitution, whereas the plaintiffs in the present suit rely on section 2.

■ The present plaintiffs also argue that their section 2 intent claim is not barred by res judicata because the applicable law has changed since the *Corder* litigation. In general, "changes in the law after a final judgment do not prevent the application of res judicata and collateral estoppel, even though the grounds on which the decision was based are subsequently overruled." *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1503 (11th Cir.1984), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 966, 83 L.Ed.2d 970 (1985). However, the former Fifth Circuit recognized an exception to that rule in cases involving constitutional law. "Faced with changing law, courts hearing questions of constitutional right cannot be limited by res judicata. If they were, the Constitution would be applied differently in different locations." *Parnell v. Rapides Parish School Bd.*, 563 F.2d 180, 185 (5th Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). *See also Jackson v. DeSoto Parish School Bd.*, 585 F.2d 726 (5th Cir.1978);

*Moch v. East Baton Rouge Parish School Bd.*, 548 F.2d 594 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977). This exception applies to cases involving section 2 as well. *Kirksey v. City of Jackson*, 714 F.2d 42, 44 (5th Cir.1983). The plaintiffs may therefore be able to escape the application of res judicata by demonstrating that the relevant law has undergone "momentous ... [and] significant" changes since the *Corder* litigation concluded. *Precision Air Parts, Inc.*, 736 F.2d at 1504.

■ The changes in the law upon which plaintiffs rely are the 1982 amendments to section 2. While these amendments were indeed quite significant, they actually had little effect on the charge of intentional discrimination presented here and therefore do not bar application of res judicata.

Before the 1982 amendments, a plaintiff challenging at-large systems had to prove that the system was created or maintained with the intent to discriminate. *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). After the 1982 amendments, by contrast, a plaintiff could prevail on a section 2 claim by showing either that the challenged practice was motivated by a discriminatory intent or that the practice had discriminatory results. To the extent the plaintiffs in the present action seek to pursue a claim based on intent rather than results, the 1982 amendments had no practical effect on their position. A plaintiff bringing a results case essentially had an entirely new cause of action, *Kirksey v. City of Jackson*, 714 F.2d at 44; whereas, a plaintiff pursuing an intent theory could as easily have brought the claim before the 1982 amendments. Indeed, the Fifth Circuit twice remanded *Corder* to the district court so that that court could reexamine the evidence on intent, *Corder II, supra; Corder I, supra;* and on the second remand the appellate court specifically directed the district judge to "entertain any application plaintiffs may care to make to present further evidence" on the intent issue. *Corder II*, 625 F.2d at 521. Admit-

tedly, there is dicta in this circuit to the effect that a plaintiff might not have been able to bring a vote dilution claim at all under section 2 prior to the 1982 amendments, *McMillan v. Escambia County, Fla. (Escambia I)*, 638 F.2d 1239, 1243 n. 9 (5th Cir.1981), *cert. dismissed sub nom. City of Pensacola v. Jenkins*, 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981), but a plaintiff could have brought the identical claim under the fourteenth amendment at any time.[9] *City of Mobile v. Bolden, supra*. The mere fact that section 2 was amended in 1982 is therefore not sufficient to bar the application of res judicata to the present claim of intentional discrimination.

The plaintiffs' third argument against the application of res judicata to their section 2 intent claim is that during the *Corder* litigation, a plaintiff simply could not present the type of historical evidence used here. This argument is without merit. In *Arlington Heights*, the Supreme Court explicitly endorsed the use of historical evidence and legislative histories for the purpose of demonstrating discriminatory intent. 429 U.S. at 267–68, 97 S.Ct. at 564–65. *Arlington Heights* was decided in 1977, one year before the first remand of the *Corder* suit. While the usual method of proving intentional voting discrimination was to satisfy a number of criteria laid out in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Bd. v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), there was nothing to prevent the plaintiffs from attempting to present an alternative form of proof. Indeed, the second appeals court decision in *Corder* made clear that after *City of Mobile v. Bolden* plaintiffs might have to do more than merely satisfy the *Zimmer* factors in order to prevail; *Corder II* almost invited the plaintiffs to

attempt an alternative approach. *Corder II*, 625 F.2d at 521. The plaintiffs have pointed to no particular development in the law since the *Corder* litigation that makes it possible for them to use evidence that they could not have used previously.

The final argument against applying res judicata to the plaintiffs' section 2 intent claim is that it would be unjust and against public policy to do so. The court is particularly concerned by two considerations. First, the rights at stake here are fundamental and are being denied to a large group of individuals; application of res judicata principles in this case could well preclude an entire class of black citizens from enjoying a basic constitutional right on an equal basis with white citizens. Second, since the court has already found a discriminatory intent on the part of the state that was manifested through the county election schemes, it seems somewhat anamolous to dismiss the intent claim against Pickens County; the state's discriminatory purposes were certainly carried out in Pickens County to the same extent as they were in the other counties involved in this suit.

The court is also reluctant to use the bar of res judicata for policy reasons. As the legislative history to the 1982 amendments makes clear, Congress intended to eradicate as soon as possible all racial discrimination, both intentional and unintentional, in the area of voting rights. Applying the bar of res judicata despite a finding of intentional discrimination by the state could be viewed as frustrating Congressional policy.

Despite these concerns founded on both justice and public policy, the court concludes that it has little choice but to dismiss the intent claim against Pickens County on the grounds of res judicata. In *Federated Department Stores, Inc. v. Moitie*,

---

**9.** Prior to its amendment in 1982, there was some question as to whether section 2 permitted a challenge to an at-large system. *Escambia I*, 638 F.2d at 1243 n. 9. However, there is no question that the 1982 amendments now permit such a challenge. *United States v. Marengo County Commission*, 731 F.2d 1546, 1556 (11th Cir.), *cert. denied*, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984). *See also Lee County Branch of NAACP v. City of Opelika*, 748 F.2d at 1479; *Escambia II*, 748 F.2d at 1046; S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S. Code Cong. & Ad. News 177; H.R.Rep. No. 227, 97th Cong., 1st Sess.

452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981), the Supreme Court held that res judicata bars relitigation of an unappealed adverse judgment even though other plaintiffs in similar actions against common defendants had actually prevailed on appeal. In reaching this conclusion, the Court explicitly rejected the argument that a court may refuse to apply the res judicata doctrine merely because it believes that injustice might result. According to the Court,

"Simple justice" is achieved when a complex body of law developed over a period of years is evenhandedly applied. The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case. There is simply "no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata.*"

*Federated Department Stores*, 452 U.S. at 401, 101 S.Ct. at 2429 (citation omitted).

 The mere fact that a suit involves a large number of plaintiffs claiming a deprivation of their rights also makes little difference. In *Nevada v. United States*, 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983), the Supreme Court held that an entire Indian tribe was barred from litigating a water rights claim on the ground of res judicata. Furthermore, a judgment in a class action will generally bind all members of the class, even in civil rights cases, *see, e.g., Gilchrist v. Bolger*, 733 F.2d 1551, 1556 n. 4 (11th Cir.1984); *Kemp v. Birmingham News Co.*, 608 F.2d 1049, 1054 (5th Cir.1979); the size of the class apparently makes little difference. The fact that a plaintiff asserts a funda-

mental constitutional right also does not affect the application of res judicata. *See, e.g., Harmon v. Berry*, 776 F.2d 259 (11th Cir.1985) (per curiam) (prisoner's claim of denial of access to court dismissed on grounds of res judicata); *Jones v. Texas Tech University*, 656 F.2d 1137 (5th Cir. 1981) (Unit A) (due process claim dismissed on grounds of res judicata); *Kemp v. Birmingham News*, 608 F.2d 1049 (5th Cir. 1979) (Title VII claim of race discrimination in employment practices dismissed on grounds of res judicata).[10]

 The court is also barred from creating an exception to res judicata on the grounds of public policy. First, *Federated Department Stores* makes clear that res judicata is to be given weight as a public policy in its own right.

The Court of Appeals' reliance on "public policy" is ... misplaced. This Court has long recognized that "public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." ... [The] "doctrine of *res judicata* is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts."

*Federated Department Stores*, 452 U.S. at 401, 101 S.Ct. at 2429 (citations omitted). Furthermore, courts have frequently applied res judicata where policies equally

---

**10.** The three more recent decisions of the former Fifth Circuit in which the court found an exception to res judicata based on considerations of justice do not help the present plaintiffs. Admittedly, in *Parnell v. Rapides Parish School Bd.*, 563 F.2d 180, 185 (5th Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), the court refused to apply res judicata because, among other reasons, "[t]o bind forever class members to a deprivation of their constitutional rights because some class members failed to enter enough evidence to meet their burden of proof is unjust." However, in light of *Gilchrist* and *Kemp*, in which class

members *were* bound by res judicata, it appears that the Eleventh Circuit has abandoned the *Parnell* dicta. In both *Jackson v. DeSoto Parish School Bd.*, 585 F.2d 726 (5th Cir.1978), and *Moch v. East Baton Rouge Parish School Bd.*, 548 F.2d 594 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 132 (1977), on the other hand, the court found that it would be unjust to apply res judicata because the applicable law had undergone a significant change. No such injustice threatens here, of course, because any change in the applicable law did not directly affect plaintiffs' intent claim against Pickens County.

important as those embodied in section 2 were at stake. *See, e.g., Kemp v. Birmingham News,* 608 F.2d 1049 (5th Cir. 1979) (Title VII).

■ The court therefore concludes that the intent claim against Pickens County must be dismissed because of the *Corder* litigation. The requirements for the application of res judicata have been met, and no possible exceptions to the doctrine appear to apply. Accordingly, the court will dismiss the plaintiffs' section 2 claim of discriminatory intent against Pickens County.

■ Pickens County also contends that the plaintiffs' section 2 results claim is barred by the *Corder* litigation. This contention is without merit. This court agrees with the new Fifth Circuit that a results claim is not barred by an intent claim brought prior to the 1982 amendments to section 2. *Kirksey v. City of Jackson,* 714 F.2d at 44. As stated already, a plaintiff bringing a results claim has an entirely new cause of action, which is a recognized exception to res judicata. *Id.* The court will therefore proceed to trial on the plaintiffs' results claim against Pickens County.

### B. *Coffee and Talladega Counties*

■ Coffee and Talladega Counties argue that the plaintiffs' claims are barred on grounds of res judicata because of the prior decisions in *Sims v. Baxley,* No. 1170–S (M.D. Ala. Dec. 22, 1971), and *Brown v. Gallion,* No. 69–697–E (N.D. Ala. Feb. 18, 1970), respectively. Neither *Sims* nor *Brown* bars the present litigation, however, for they both involved one person, one vote claims rather than claims of vote dilution premised on either intentional racial discrimination or discriminatory results. Furthermore, it appears that black voters, as black voters specifically, did not participate in either *Sims* or *Brown.* Therefore, since the present action involves new parties raising new claims, res judicata does not apply.

■ Coffee and Talladega Counties appear to argue also that this action is barred

because the courts in *Sims* and *Brown* retained continuing jurisdiction. This argument is without merit. The courts retained jurisdiction only over the particular claims presented in those actions; they did not—indeed, could not—retain jurisdiction over every possible claim related to voting rights that might arise in the future.

The court therefore concludes that it may proceed with the claims against Coffee and Talladega Counties despite the decisions in *Sims* and *Brown.*

## V. TRANSFER AND SEVERANCE

Etowah County contends that joinder of all the counties and their officials in one action is improper. In addition, all of the counties except Coffee County contend, first, that venue properly lies in the Northern District of Alabama rather than the Middle District and, second, that it would be inefficient and inconvenient to try all of the plaintiffs' claims in a single proceeding in this district. The five counties making these contentions are all located in the Northern District and they seek severance and transfer of their claims to that district. As explained below, all of these contentions are meritless.

### A. *Joinder*

Under the Federal Rules of Civil Procedure, "joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Fed.R.Civ.P. 20(a) provides in relevant part that

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

There is no strict rule for determining what constitutes the same transaction or series of transactions for purposes of Rule 20(a). *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1333 (8th Cir.1974); *United States v.*

*Yonkers Bd. of Ed.*, 518 F.Supp. 191, 195 (S.D.N.Y.1981); 7 Wright & Miller *Federal Practice and Procedure* § 1653, at 270. Courts have allowed joinder of defendants where "[t]he operative facts are related even if the same transaction is not involved," *C.A.B. v. Carefree Travel Inc.*, 513 F.2d 375, 384 (2d Cir.1975), where there are "enough ultimate factual concurrences that it would be fair to the parties to require them to defend jointly," *Hall v. E.I. DuPont De Nemours & Co.*, 345 F.Supp. 353, 381 (E.D.N.Y.1972), and where the claims are "reasonably related." *Mosley*, 497 F.2d at 1333.

In this case, the plaintiffs' claims arise out of the state's enactment of at-large systems and numbered place laws that enhanced the discriminatory effects of the at-large systems. Under any of the various interpretations of Rule 20, it seems clear that the plaintiffs' claims against all of the counties do arise from a single transaction or series of transactions.

 Plaintiffs' claims also raise common questions of law or fact as to all the defendants. For example, both the results and the intent claims involve alleged violations of the Voting Rights Act, of course, and they both require a close examination of the workings of at-large systems and numbered place laws. Moreover, several of the factors used to make out a results claim require consideration of the very same evidence used to support the intent claims. Examples of results factors that overlap with the evidence used for the intent claims include:

> the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; ... the extent to which the state or political subdivision has used ... majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; ... [and] whether the policy underlying the state

or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177, 206–07. Furthermore, the evidence of present day adverse impact needed to support an intent claim would also support a results claim. The plaintiffs therefore appear to have satisfied both requirements of Fed.R.Civ.P. 20(a); their claims arise out of the same transaction or series of transactions and raise common questions of law and fact. It makes no difference that the defendants from one county may have little interest in the claims asserted against the other counties, for Rule 20(a) expressly provides that "[a] plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded."

Particularly in light of the Supreme Court's statement that joinder rules should be interpreted to encourage "the broadest possible scope of action consistent with fairness to the parties," *United Mine Workers*, 383 U.S. at 724, 86 S.Ct. at 1138, the court has no trouble concluding that joinder is proper here. Indeed, joinder seems especially fitting in this case, for, by preventing multiple litigation, the joinder of all the defendants in one action will help carry out the expressed policy of the Voting Rights Act that voting discrimination be dealt with "not step by step, but comprehensively and finally". *See* S.Rep. No. 417, 97th Cong., 2d Sess. 5, *reprinted in* U.S.Code Cong. & Ad.News. 177, 182. Accordingly, the court concludes that Etowah County's contention that there is improper joinder lacks merit.

### B. *Venue*

#### i.

 In a civil action in which jurisdiction is not based solely on diversity of citizenship, venue is proper in the judicial district "in which the claim arose...." 28 U.S.C.A. § 1391(b). The plaintiffs' claims of intentional discrimination clearly arose in this district. The thrust of these claims

is that the state legislature intended to discriminate against black persons when it passed the numbered place laws in the early 1960's and when it enacted at-large systems in five of the six counties. The claims therefore arose in Montgomery, which is in this district, because that is where the legislature met and where it passed the challenged laws. Furthermore, since the plaintiffs' results claims are based on these same laws, although the focus is on the result of the laws rather than the intent behind them, it is reasonable to conclude that the results claims arose in this district as well. *Cf. Myers v. American Dental Ass'n,* 695 F.2d 716, 723 (3d Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983) (in antitrust action challenging professional code of ethics, venue lies in Chicago, where ethics code was passed, rather than in Virgin Islands, where alleged restraint of trade actually occurred).

▆ Even if there is some validity to the argument that the claims must have arisen in the counties where the plaintiffs actually vote, the court still finds that venue is proper here. According to the Supreme Court,

> the broadest interpretation of the language of § 1391(b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district, a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim.

*Leroy v. Great Western United Corp.,* 443 U.S. 173, 185, 99 S.Ct. 2710, 2717, 61 L.Ed.2d 464 (1979) (footnote omitted). In this case, the Middle District is at least as plausible as the locus of the claims as the Northern District. While the defendants' witnesses are from the Northern District, they certainly are not unavailable for a trial in the Middle District; this simply is not a situation in which the defendants will be forced to travel unreasonable distances.[11] *Cf. Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant,* 760 F.2d 312, 317 (D.C.Cir.1985) (venue improper in District of Columbia in part because large number of witnesses will be from California). Furthermore, some of the plaintiffs' witnesses are from the Southern District,[12] which means that, if anything, the Middle District is the better choice.

The Middle District is also a plausible choice with respect to the "accessibility of other relevant evidence." Given the proximity of all of the counties to this district, the relevant evidence for all of the plaintiffs' claims should be sufficiently accessible; indeed, none of the defendants pointed to any evidence that would be inaccessible or even just less accessible if the claims are tried in this district. Finally, although it may be somewhat more convenient for the defendants to be in the Northern District rather than the Middle District, the court finds that the two district are at least "approximately equal" in this respect. *Cf. Noxell,* 760 F.2d at 317 (where defendant resides in California, and has done only minimal business in District of Columbia, venue is improper in District of Columbia because of hardship on defendant).

▆ When it may be found with approximately equal plausibility that either of two districts is the locus of the claim, it is up to the plaintiff to choose between them. Here, either the Northern or the Middle District could be the locus, and the plaintiffs have chosen the Middle District. The court sees no reason to disturb that choice.

---

11. Indeed, witnesses travelling to the courthouse from certain points in the Northern District might actually have a shorter trip than witnesses travelling from the southernmost areas of the Middle District.

12. One of the plaintiffs' witnesses actually lives in Montgomery during the week but officially resides in Conecuh County, which is in the Southern District.

ii.

■ Venue is also proper in this district under 28 U.S.C.A. § 1392(a), which provides that "[a]ny civil action, not of a local nature, against defendants residing in different districts in the same State, may be brought in any of such districts." Since all of the defendants are from Alabama and one of the defendant counties is located within this district, it appears that the action may be brought here if the defendants are properly joined. For the reasons given in Part A above, the court concluded that joinder is proper in this case. As a result, venue in this district is also proper under 28 U.S.C.A. § 1392(a). *See United States v. Mississippi*, 380 U.S. 128, 142, 85 S.Ct. 808, 815–16, 13 L.Ed.2d 717 (1965) (where county registrars from different judicial districts acted "as part of a state-wide system designed to enforce [voter] registration laws in a way that would inevitably deprive colored people of their right to vote solely because of their color," joinder of all registrars is permissible and venue is therefore proper as to all registrars). Venue is therefore proper in this district under either of two theories.

## C. *Convenience and Efficiency*

■ Calhoun County, Etowah County, Lawrence County, Pickens County, and Talladega County have also challenged trial in the Middle District on the grounds of inconvenience and inefficiency. In making these assertions, the counties rely on Fed.R. Civ.P. 20(b), which allows a court to order separate trials to "prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party ... who asserts no claim against him;" Fed.R. Civ.P. 42(b), which allows a court to order separate trial of any claim "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy;" and 28 U.S.C.A. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other dis-

trict or division where it might have been brought."

The court fails to see why it would be inconvenient or inefficient to try the plaintiffs' claims in a single proceeding in this district. Since the plaintiffs' claims of intentional discrimination rely on the same legal theories and on primarily the same evidence for each county, it would obviously be less convenient and less efficient to sever and transfer these claims; the plaintiffs would be forced to present the same evidence and arguments over and over, the defendants would lose the opportunity to work together to develop a defense, and several different judges would have to decide virtually identical claims. Similarly, since, as explained above, there is considerable overlap between the evidence used to support results claims and intent claims, it would also be less convenient and efficient to sever the results claims. An order severing any of the claims would also tend to hinder rather than help the cause of efficiency because of the great familiarity this court has already developed with the issues and evidence in this case. In determining whether transfer is appropriate under Fed. R.Civ.P. 42(b), "[i]t is the interest of efficient judicial administration that is to be controlling, rather than the wishes of the parties." 9 Wright & Miller, *Federal Practice and Procedure* § 2388, at 279. Finally, none of the counties has shown why trial in this district would be particularly inconvenient, and, in light of the geographical proximity of the Northern and Middle Districts, the court doubts that any real inconvenience exists. In any case, a single proceeding in the Middle District is clearly more convenient for the plaintiffs, and section 1404(a), unlike the venue provisions, does not distinguish between the convenience of the plaintiffs and the convenience of the defendants.

The court concludes that to the extent there will be any inconvenience at all, it is not sufficient to justify a transfer. The court also concludes that, if anything, the interests of efficiency and judicial economy would be disserved by an order severing and transferring the plaintiffs' claims.

Since the defendants have raised no other grounds for their motions to sever and transfer, these motions are due to be denied.[13]

## VI. CLASS CERTIFICATIONS

■■■ The plaintiffs seek certification pursuant to Fed.R.Civ.P. 23(a) and (b)(2) of separate plaintiff classes for Calhoun County, Coffee County, Etowah County, Lawrence County, Pickens County, and Talladega County. They ask that the court certify a class of all black citizens for each of the six counties, with the named plaintiffs from each county representing the black citizens of that county. In order to obtain certification of a class under Rule 23(a) and (b)(2), a plaintiff must satisfy five requirements.

The first requirement is that the proposed class must be so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). According to the 1980 census, the black population in each of the six defendant counties ranges from a low of 5,074 in Lawrence County to a high of 22,745 in Talladega County. While there is no established rule for how large a class must be to satisfy the numerosity requirement, classes ranging in size from approximately 5,000 members to 22,000 members clearly are sufficiently numerous to make joinder impracticable. Each of the proposed six classes thus meets the numerosity requirement.

The second and third requirements are that there must be questions of law or fact common to the class, Rule 23(a)(2), and that the claims or defenses of the representative plaintiff must be typical of the claims of the class. Rule 23(a)(3). These two requirements of commonality and typicality "tend to merge." *General Telephone Co.* *of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982). They "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* The plaintiffs from each county have met the commonality and typicality requirements for the black citizens of the county whom they seek to represent. The plaintiffs and class members from any given county are all subjected to and challenging the same electoral scheme and they all rest their challenge on the same facts and theories.

The fourth requirement is that the representative plaintiffs will fairly and adequately protect the interest of the class they seek to represent. In determining this issue, the court must inquire into "first, the adequacy of the representative, and second, the adequacy of his counsel." 3B *Moore's Federal Practice* ¶ 23.07[1], at 23–202.

> As to adequacy of the representative, the traditional approach has been to consider (1) whether the interest of the named party is coextensive with the interests of the other members of the class; (2) whether his interests are antagonistic in any way to the interests of those whom he represents; (3) the proportion of those made parties as compared with the total membership of the class; (4) any other facts bearing on the ability of the named party to speak for the rest of the class.

*Id.* at 23–203 (footnotes omitted). First, for reasons already given, the interest of

---

**13.** The court recognizes that since the intent claim against Pickens County is barred by res judicata, Pickens County's arguments with respect to joinder, venue, and convenience and efficiency differ somewhat from those raised by the other counties. However, two considerations lead the court to conclude that Pickens County's arguments are equally without merit. First, as explained above, there will be considerable overlap between the evidence the plaintiffs have already presented and will present on the intent claims and the evidence they will have to present on the results claim against Pickens County. Second, the court is reluctant to prolong the alleged denial of the right to vote to black citizens of Pickens County any longer than necessary, and forcing the plaintiffs to start all over in a new court in the Northern District could well produce just such a result.

representative plaintiffs for a given county is coextensive with that of the other members of the class they seek to represent. Second, there is no apparent conflict between the interest of the representative plaintiffs for each class and those of other members of the class: they all challenge the same electoral scheme under the same theories. And, third, while each class is very large, there are enough representative plaintiffs for each class to provide adequate representation. The representative plaintiffs for all classes are thus adequate class representatives for the classes they seek to represent.

The court also finds that counsel retained by all representative plaintiffs are adequate. They have successfully brought many voting rights suits and are quite experienced in civil rights and class action litigation generally.

The fifth and final requirement is that the party opposing a class must have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Rule 23(b)(2). In each of the six proposed classes, the parties opposing the class are the county and various county officials. In each case, the county and its officials have acted on grounds generally applicable to all black voters in the county, thereby making appropriate final injunctive relief with respect to the county.

Since the plaintiffs have therefore met the requirements of Rule 23(a) and (b)(2), the court will certify six classes with the named plaintiffs from each county representing the black citizens of that county.

## VII. CONCLUSION

In conclusion, the court will, first, enter a preliminary injunction against five of the six counties remaining in this lawsuit. The injunction will require that Calhoun County, Coffee County, Etowah County, Lawrence County, and Talladega County submit time schedules for the development, approval, and implementation of new elec-

tion plans by the first of next year. Second, the court will dismiss the plaintiffs' section 2 intent claim against Pickens County because the claim is barred by res judicata. Third, the court will retain and set for trial the remaining claim against Pickens County and all claims against the other five counties. Fourth and finally, the court will certify plaintiff classes for each of the six counties remaining in this lawsuit.

An appropriate order and injunction will be entered.

## ORDER AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the plaintiffs' February 6, 1986, petition for preliminary injunction be and it is hereby granted in part and denied in part; and

(2) That defendants Calhoun County, Coffee County, Etowah County, Lawrence County, and Talladega County and their officials, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise, be and they are each hereby ENJOINED and RESTRAINED from failing to submit to the court within 21 days from the date of this order their time schedules for the development, approval, and implementation by January 1, 1987, of new commission election plans that comply with section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.

It is further ORDERED:

(1) That defendants Pickens County and its officials' January 13, 1986, motion to dismiss be and it is hereby granted to the extent that plaintiffs' claim of intentional discrimination is barred by res judicata and that the motion be and it is hereby denied in all other respects; and

(2) That the following motions be and they are hereby all denied: defendants Calhoun County and its officials' January 16,

1986, motion to dismiss or to transfer; defendants Coffee County and its officials' January 15, 1986, motion to dismiss; defendants Etowah County and its officials' January 13, 1986, motion to dismiss and January 23, 1986, amended motion to dismiss, motion to sever, and motion to transfer; defendants Lawrence County and its officials' January 10, 1986, motion to dismiss or transfer, or in the alternative, to sever and transfer, etc.; defendant Richard I. Proctor's January 15, 1986, motion to dismiss; and defendants Talladega County and its officials' January 23, 1986, motion to dismiss or to sever and transfer.

It is further ORDERED:

(1) That the plaintiffs' February 6, 1986, petition for class certification be and it is hereby granted;

(2) That this action be and it is hereby declared properly maintainable as a class action with respect to six plaintiff classes;

(3) That a class consisting of all black citizens of Calhoun County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Earwen Ferrell, Ralph Bradford, and Clarence J. Jairrels;

(4) That a class consisting of all black citizens of Coffee County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Damacus Crittenden, Jr., Rubin McKinnon, and William S. Rogers;

(5) That a class consisting of all black citizens of Etowah County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Nathan Carter, Spencer Thomas, and Wayne Rowe;

(6) That a class consisting of all black citizens of Lawrence County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Hoover White, Moses Jones, Jr., and Arthur Turner;

(7) That a class consisting of all black citizens of Pickens County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Maggie Bozeman, Julia Wilder, Bernard Jackson, and Willie Davis; and

(8) That a class consisting of all black citizens of Talladega County, Alabama be and it is hereby certified as a plaintiff class, to be represented by named plaintiffs Louis Hall, Jr., Ernest Easley, and Byrd Thomas.

It is further ORDERED:

(1) That this cause is set for trial on July 23, 1986, at 8:30 a.m. in the fourth floor courtroom of the federal courthouse in Montgomery, Alabama;

(2) That the parties are to complete discovery and exchange lists of witnesses and exhibits by July 16, 1986; and

(3) That this cause is set for pretrial on July 16, 1986, at 4:30 p.m. at the federal courthouse in Montgomery, Alabama.