Alice Bruce **PRESLEY**, et al., Plaintiffs,

v.

**ETOWAH COUNTY COMMISSION,**
Defendant.

Civ. A. No. 89–T–459–E.

United States District Court,
M.D. Alabama,
Eastern Division.

Nov. 29, 1994.

James U. Blacksher, Leslie Proll, Birmingham, AL, Lanie Guinier, Philadelphia, PA, Pamela Karlan, Charlottesville, VA, Julius L. Chambers, Dana Cunningham, NAACP Legal Defense Fund, New York City, John C. Falkenberry, Sirote & Permutt, Edward Still, Birmingham, AL, for Ed Peter Mack, Nathaniel Gosha, III, Lawrence C. Presley, Floyd Donald, Walt Higgins, Daniel Littlefield, Alice Bruce Presley, Joyce Cowser Riggins, David L. Williams and Gladys A. Barnes.

James U. Blacksher, John C. Falkenberry, Edward Still, Birmingham, AL, for William America.

Bart Gregory Harmon, James W. Webb, Kendrick E. Webb, Webb & Eley, P.C., Montgomery, AL, for Russell County Com'n.

Jack Floyd, Mary Ann Stackhouse, Floyd, Keener, Cusimano & Roberts, Gadsden, AL, James E. Turnbach, Turnbach & Warren, P.C., Gadsden, AL, for Etowah County Com'n.

James W. Webb, Webb & Eley, P.C., Montgomery, AL, for Escambia County Com'n.

James P. Turner, Gerald W. Jones, J. Gerald Hebert, Jennifer C. Cass, Poli A. Marmolejos, Barry H. Weinberg, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, Redding Pitt, U.S. Atty., Montgomery, AL, for U.S. amicus.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In this lawsuit, plaintiffs—who represent a class of African–American residents of a majority-black electoral district in Etowah County, Alabama—charge that certain policies and practices of defendant Etowah County Commission deny them and the elected representative of their district the same rights and privileges enjoyed by the residents and elected representatives of majority-white districts. Under a 1986 consent decree settling a claim that the Etowah County's system of at-large elections violated § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973 (West 1994), the county switched to a system by which each county commissioner would be elected from a single-member district.[1] *Dillard v. Crenshaw County,* Civil Action No. 85–T–1332–N (M.D.Ala. Nov. 12, 1986).[2] Plaintiffs allege that, upon the election of two new commissioners from single-member districts in 1986, one of whom was an African–American from a majority-black district, the Etowah County Commission undertook by resolution and practice to deny the new commissioners an equal share of authority over the construction and maintenance of roads and bridges in the county. Historically, the oversight of road and bridge work constituted the primary function of a commissioner in Etowah County. Plaintiffs claim that the Commission's actions violated the terms of the 1986 consent decree; § 2 of the Voting Rights Act;[3] the fourteenth and fifteenth amend-

---

1. Section 2 of the Voting Rights Act provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C.A. § 1973 (West 1994).

2. This lawsuit was one of many *Dillard* cases that had been before the court challenging at-large election systems across Alabama. The court traced the evolution of these cases in some detail in *Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459, 1461 (M.D.Ala.1988) (Thompson, J.).

3. Because the 1986 decree embodies the relief that all parties to *Dillard v. Crenshaw County* agreed was appropriate to vindicate the § 2 violation, plaintiffs' claim for enforcement of the decree in the instant case rests on § 2 as well,

ments to the United States Constitution, as enforced by 42 U.S.C.A. § 1983 (West 1994); and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000d through 2000d–7 (West 1981 & Supp.1994).[4]

This lawsuit is now before the court after a trial of plaintiffs' claims held on February 28, 1994. Based upon the evidence presented at trial and upon a review of the entire record, the court holds that the Commission's actions violated the terms of the 1986 consent decree.

## I. FACTUAL BACKGROUND

### A. Road and Bridge Practices before the 1986 Consent Decree

From at least 1964 until the implementation of the 1986 consent decree, the Etowah County Commission was composed of five members, four elected at-large from districts in which they were required to reside and a chairperson elected at-large with no residency requirement. Immediately prior to 1986, the chairperson of the Commission was R.V. "Boolie" Hitt, and the four residency-district commissioners were Jesse Floyd Burns, Wendell Bryant, W.A. Lutes, and Billy Ray McKee, all of whom are white.

Each of the four residency districts constituted an administrative "road district," with a road shop physically located in each of the districts; there was no county-wide "central shop."[5] The commissioner elected to serve a district exercised complete and independent supervision over the road shop, equipment, and road crew in his district.[6] It was the practice of the Commission to vote as a collective body on the division of funds among the road districts, but once funds were divided each commissioner exercised independent control over spending priorities within his district.[7]

Commissioner McKee testified that, prior to 1986, the four residency-district commissioners were called "road commissioners."[8] These commissioners spent the vast majority—75 to 90%—of their time on road and bridge work.[9] Although Hitt was chairperson of the Commission, he kept his "hands off" the road districts because the county had "the elected official out there."[10] In practice, each road commissioner had the discretion to make personnel decisions involving his road shop and to contract out road and bridge work. Even though personnel decisions had to be approved by the entire Commission, approval was given as a matter of course.[11] Although each commissioner had to seek the approval of the entire Commission if he desired to contract out road and bridge work in his district, as opposed to using his road shop's workers, this approval

albeit on the original § 2 claim in the earlier case. The court sees plaintiffs' § 2 claim in the instant case as a separate matter in the sense that it is not based on the consent decree.

4. As discussed more fully below, plaintiffs' claim under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c (West 1994), has now been entirely disposed of by a three-judge court; each of plaintiffs' remaining claims is left for resolution by this single-judge court.

5. Hitt deposition at 27.

6. Although the court and parties use the terms "road shop" and "road commissioner," the work done in these shops and supervised by the commissioners included both road and bridge work.

7. The money divided among the road districts included the proceeds of gasoline taxes and certain federal highway funds. Hitt deposition at 18–20.

8. McKee deposition at 31–32.

9. According to Chairperson Hitt, prior to the 1986 decree, "practically every commissioner would spend the majority, ninety percent of his time, in his districts [sic] seeing about his roads." Hitt deposition at 10–11. Defense counsel represented to the court that the "consensus of the commission" was that "about 75 percent of their time [was] taken with road and bridge management." Transcript of Hearing on Single–Judge Issues (Feb. 28, 1994) (hereinafter "Transcript") at 138.

10. Hitt deposition at 24.

11. Commissioner McKee testified that he could not recall a time when the whole Commission overruled the personnel recommendation of a commissioner for a position within his district. McKee deposition at 41–42. Commissioner Burns testified that he never voted against the personnel recommendation of another commissioner for a position within his district. Burns deposition at 15.

was also given as a matter of course.[12]

Historically, the Commission did not always divide the road and bridge funds equally among the four districts. A review of the road and bridge budgets from 1981 through 1986 shows that district 3 generally received less funding than the other districts.[13] However, each of the four districts received substantial funding in each fiscal year from 1981 to 1986, and some disparities in appropriations are explainable by funds having been carried over from the previous fiscal year.

The chairperson of the Commission was not a road commissioner. Unlike the road commissioners, he was not subject to a district-residency requirement, and, accordingly, his duties were county-wide and did not involve the road shops. Also, his duties, unlike those of the road commissioners, were essentially ministerial and involved very little discretion. He was responsible for overseeing the solid waste authority, preparing the budget, and managing the courthouse building and grounds.[14] The four road commissioners had minimal involvement in county matters not involving road and bridge work. When asked what non-road-and-bridge work responsibilities the road commissioners had, Chairperson Hitt stated that they attended Commission meetings and functions and assisted him in decisionmaking.[15] With respect to decisionmaking not involving road and bridge work, however, Hitt further testified: "I'd just mention to them that I was going to do such and such and such, and they'd say go to it if you have the money. Never any dissention." [16]

The court finds, therefore, that at the time the 1986 consent decree was written and entered, the four residency-district commissioners were "road commissioners," who had virtually unfettered independent control over road and bridge operations, expenditures, and staffing in their respective districts, and very little responsibilities unrelated to road and bridge work. Indeed, they were elected to be road commissioners and this was the primary function they performed in serving their constituents.

### B. The 1986 Consent Decree and the Switch to Single–Member Districts

In *Dillard v. Crenshaw County*, Civil Action No. 85–T–1332–N (M.D.Ala.), a group of African–American residents of Etowah County charged that the at-large system used to elect the County Commission violated § 2 of the Voting Rights Act. After finding adequate evidence to support plaintiffs' claim that the at-large system was "a product of intentional discrimination," *Dillard v. Crenshaw County*, 640 F.Supp. 1347, 1357 (M.D.Ala.1986) (Thompson, J.), this court preliminarily enjoined the use of the system and ordered the implementation of a new election plan that would comply with § 2. *Id.* at 1373. [17]

In compliance with the court's order, plaintiffs and Etowah County entered into a proposed consent decree, in which it was agreed that the Commission would increase in membership to six commissioners and that each commissioner would be elected from a single-member district. The decree provided for the single-member district elections to be staggered: commissioners from new districts 5 and 6 were to be elected by special general election in December 1986; districts 2 and 3 were to be filled through single-member elections in 1988; and districts 1 and 4 were to be filled through single-member elections in

---

12. Chairperson Hitt testified that a commissioner's recommendation that work be contracted out was never objected to by the other commissioners: "they would all concur in that commissioner's district, because that was his responsibility." Hitt deposition at 13.

13. Defendant's trial exhibit 1. For example, in fiscal year 1981–82, districts 1, 2, and 4 each received $230,721 in gasoline tax road funds, while district 3 received only $153,794. *See also* Hitt deposition at 21.

14. Hitt deposition at 15.

15. *Id.* at 13–14.

16. *Id.* at 14.

17. By the same order, a number of other counties that, like Etowah County, elected their county commissions under an at-large system were also preliminarily enjoined from proceeding under an at-large system.

1990.[18] The proposed decree also provided that the chairperson of the Commission would continue to serve until January 1993, but would no longer be entitled to vote on the Commission. Subsequent to the completion of the chairperson's term in 1993, each commissioner would serve as presiding officer of the Commission for one year on a rotating basis.[19] The court approved and adopted the decree by order of November 12, 1986, as a full and complete remedy for plaintiffs' § 2 claim. *Dillard v. Crenshaw County,* Civil Action No. 85–T–1332–N (M.D.Ala. Nov. 12, 1986).

One of the six single-member districts drawn under the decree—district 5—was a majority-black district.[20] In December 1986, the voters of district 5 elected Lawrence C. Presley, the first African–American commissioner in Etowah County's history and the original named plaintiff in the instant lawsuit. Also in December 1986, Billy Ray Williams was elected from the newly created district 6. Commissioners Presley and Williams assumed office in January 1987. Presley served as commissioner from district 5 until he passed away on January 10, 1993. The Governor of Alabama then appointed David L. Williams, an African–American, as Presley's replacement, and Williams continues to represent district 5 to this day. Commissioner Billy Ray Williams continues to represent district 6. Of the four road commissioners in office prior to the decree, Commissioners McKee, Burns, and Lutes remain in office. Marion T. "Bull" Smith replaced Commissioner Bryant.

Paragraph 3 of the 1986 consent decree provided as follows: "When the District 5 and 6 Commissioners are elected in the special 1986 election, they shall have all the rights, privileges, duties and immunities of the other commissioners, who have heretofore been elected at-large, until their successors take office." *Dillard v. Crenshaw County,* Civil Action No. 85–T–1332–N (M.D.Ala. Nov. 12, 1986). Jerome Gray, state field director for the Alabama Democratic Conference, participated in the negotiation of the 1986 decree. Gray testified that ¶ 3 was included in the decree to ensure that the newly elected commissioners "would have the same rights and privileges and access to resources that all the other commissioners had." [21] Gray defined "equal access to resources" to mean "Financial resources that the county would have to operate roads and bridges as well as the opportunity to and the privilege to hire staff in their respective districts." [22]

Gray further testified that the negotiators of the decree specifically rejected the proposal of switching to a unit system "where the county government puts all of its resources in one pot, and allows the county engineer to pretty much manage the operation of the employees working on roads and bridges in the county." [23] The negotiators were thus aware that the county commissioners would continue to have executive control over road and bridge operations. In light of experiences in other counties, "where sometimes there would not be the sense of cooperation of sharing and fairness in terms of access to resources, particularly financial resources and the ability to employ staff, and to hire such things as foreman for the districts," Gray testified, "we felt that we needed some specific language to protect the commission-

---

**18.** District 5 is predominantly within the limits of the City of Gadsden and the City of Attalla; and district 6 is predominantly located within the limits of the City of Gadsden.

**19.** Paragraph 6 of the decree further provided that, upon completion of the chairperson's term in 1993, the Commission shall employ a non-voting chief executive officer to "be responsible for the execution and implementation of the policies adopted by the Commission."

**20.** More than 66% of district 5's residents were African–American; in contrast, only between 0.83% and 6.84% of the other five districts' resi-

dents were African–American. The court takes judicial notice that Etowah County has a total population of 99,840, of whom 13,799 (13.8%) are African–American. Of all African–American residents of Etowah County, 94.3% live within the municipalities of Gadsden and Attalla. District 5, which consists mainly of parts of Gadsden and Attalla, contains 79% of Etowah County's African–American residents.

**21.** Transcript at 53.

**22.** *Id.* at 56.

**23.** *Id.* at 54.

ers elected in the new districts so that they would have access, equal access to resources, and that if there was a violation of that, then we would petition...."[24] When asked how ¶3 was to be implemented in practice, Gray stated that he envisioned the system operating as it did prior to the 1986 decree, with each commissioner having "the executive function and sole authority to control moneys in his or her respective districts."[25] The court credits all of Gray's testimony.

According to Gray, therefore, the 1986 consent decree provided for essentially the following: first, the two new commissioners would share fully the rights and privileges, including independent control over road and bridge work, that the four "holdover" road commissioners from districts 1 through 4 had exercised before entry of the decree; and, second, the four holdover commissioners, although constituting a majority on the Commission, would not be able to take away or otherwise impair this right of the two new commissioners. The unit system was rejected because it offered no similar sharing of authority over road and bridge work and no similar protection of the rights of the two new commissioners.

### C. Road and Bridge Practices after the 1986 Consent Decree

The election of the two new commissioners from districts 5 and 6 brought little practical change to the system of road and bridge budgeting and supervision in Etowah County. From January 1987, when Commissioners Presley and Billy Ray Williams took office, until August 1987, the four holdover commissioners continued to serve as road commissioners and to operate the four road shops as if no new commissioners had been elected. The holdover commissioners agreed to the road and bridge budget among themselves and submitted it directly to the county clerk.[26] During this period from January to August 1987, no duties were assigned to either Presley or Billy Ray Williams. Chairperson Hitt testified that Presley and Billy

Ray Williams were "more or less" his "companions" during their first eight months on the commission.[27]

In August 1987, the Commission, over the "no" votes of Commissioners Presley and Billy Ray Williams, passed two resolutions— a road supervision resolution and a common fund resolution—to formalize the holdover commissioners' exclusive control over road and bridge operations. The road supervision resolution provided that each of the holdover commissioners "shall oversee and supervise the road workers and the road operations assigned to the road shop located in" his district. The resolution granted holdover Commissioner McKee control over the "road shop located in district 2" even though that road shop was now physically located in Commissioner Presley's district as a result of the redrawing of district boundaries under the 1986 decree.[28] The road supervision resolution further provided that the four holdover commissioners "shall jointly oversee, with input and advice of the County Engineer, the repair, maintenance and improvement of the streets, roads and public ways of all of Etowah County." Thus, the resolution on its face gave exclusive control of road operations for "all of Etowah County" to the four holdover commissioners and did not require the holdover commissioners to seek even the "input and advice" of Commissioners Presley and Billy Ray Williams.

The road supervision resolution assigned duties to Commissioners Presley and Billy Ray Williams, but those duties were countywide, ministerial, and essentially the type that had been exercised by the chairperson. The resolution provided that Commissioner Presley "shall oversee and supervise maintenance employees and the repair, maintenance and operation of the Etowah County Courthouse," one of the chairperson's duties before entry of the consent decree, and that Commissioner Billy Ray Williams "shall oversee and supervise the employees of the Engineering Department of Etowah County and

---

24. *Id.* at 55–56.

25. *Id.* at 57.

26. Hitt deposition at 29.

27. *Id.* at 74–75.

28. *Id.* at 28; McKee deposition at 29.

the operations of that department." Finally, the resolution provided that both Presley and Williams "shall jointly oversee the maintenance and operations of the Etowah County Farmers Market." Unlike the duties assigned to the holdover commissioners, the duties assigned to Presley and Williams lacked the type of independent discretion and budgetary control through which they could serve their respective constituencies. When asked why Commissioners Presley and Williams were not given road and bridge supervision responsibilities, Chairperson Hitt testified that he thought it was because they did not have road shops. He further testified, however, and the court so finds, that it was not necessary for a commissioner to have a shop in his district in order to have road supervision responsibilities.[29]

The second resolution, passed in August 1987, the common fund resolution—again passed over the "no" votes of Presley and Williams—formalized the four holdover commissioners' control over the entire road and bridge budget. The common fund resolution provided that, during the fiscal year 1987–88, all funds budgeted for road and bridge work would be "placed and maintained in common accounts, not be allocated, budgeted or designated for use in districts, and be used county-wide in accordance with need." To continue the pre–1986 practice of giving each district a road and bridge budget would have required the Commission to award budgets to districts 5 and 6. By creating a "common" fund, subject to the control of the majority—such that the four holdover commissioners could always vote down the district 5 and 6 commissioners—the holdover commissioners could then ensure control of the entire road and bridge budget. The common fund resolution then provided that during the fiscal year 1987–88, all road work "shall be accom-

plished by the road workers of Etowah County operating out of the four present road shops located in the County."

Because under the common fund resolution funds can be given to only the four road shops and because under the road supervision resolution the four holdover commissioners have exclusive control over those road shops, the four holdover commissioners acquired exclusive control over all road and bridge funds. The common fund resolution, while giving the appearance of simply redistributing authority back to the Commission as a whole, in fact excluded the two new commissioners from the budgetary process altogether.[30]

The common fund resolution was never implemented, however.[31] The Commission continued to meet each year before the adoption of the annual county budget and divided up all road and bridge funds between districts.[32] A shell of a common fund seems to have existed prior to fiscal year 1991–92, but this county-wide fund was simply a pass-through for the allocation of funds to particular districts.[33] Once road funds were allocated to a particular district, they remained there and could be carried over into subsequent fiscal years if unspent.[34]

Although the Commission did not implement the common fund resolution but instead distributed funds by district, it allocated no funds to districts 5 and 6 between 1987 and 1992.[35] In fiscal year 1992–93, the Commission began to budget some road funds for districts 5 and 6: district 5 was allocated $30,001 and district 6 was allocated $70,000, out of a road budget in excess of two million dollars. By contrast, during the same fiscal year, districts 1 and 2 each received $424,999 and districts 3 and 4 each received $650,-

---

29. Hitt deposition at 80.

30. The common fund resolution also had a grandfather provision which provided that any unspent funds from fiscal year 1986–87 could only be used in the districts to which they were originally assigned, notwithstanding the creation of two new districts under the 1986 consent decree.

31. Transcript at 58–59, 68–69 (testimony of McKee).

32. McKee deposition at 21.

33. Akins deposition at 45–46.

34. Burns deposition at 9.

35. Billy Ray Williams deposition at 21–22; *see also* David Williams deposition at 16.

000.[36] In fiscal year 1993–94, districts 5 and 6 also received substantially lower budgets than the other districts.[37] Neither of the district 5 or 6 commissioners has voted in favor of a budget since 1986.[38] The county executive, David Akins, explained the distribution of funds by district as follows:

"I prepared the total gasoline tax budget, let the commissioners know how much totally they had to spend, and then basically they decided on—specifically Commissioner McKee came up with a breakdown that got a four to two vote, and that was the majority vote so that's how ... they decided. And how they came up with these numbers, I'm not really sure." [39]

Although the common fund resolution would also have allowed the holdover commissioners to retain their exclusive control over road and bridge funding, the holdover commissioners bypassed the mechanism of a common fund and proceeded to budget for themselves either all, or since 1992, almost all, of Etowah County's road and bridge budget.

The Etowah County Commission passed a third resolution addressing road work in January 1990, which provided in relevant part:

"4. Minor road repair, such as repair of potholes, and general road maintenance, such as grass cutting, shall not be subject to a vote of the Commission, but shall be determined by the Commissioner responsible for the district where such general maintenance and minor repair must be done.

"5. With respect to the supervision of major and minor road repair and construction, each Commissioner shall supervise the work performed in his district.

"6. With respect to the daily routine operation of each road shop, each Commissioner assigned to each road shop shall continue to supervise said operations."

The county engineer, Roger Ellison, was also to submit recommendations for prioritizing road work. This 1990 resolution—intended as a substitute for the 1987 road supervision resolution—would have granted the district 5 and 6 commissioners discretionary control over minor road work and supervisory control over major and minor road work in their districts. For no apparent reason, however, it was never implemented.[40]

Instead, the Commission continues to operate under the terms of the 1987 road supervision resolution, with each of the four holdover commissioners exercising autonomous control over one of the four county road shops, road crews, and road equipment. The county engineer does not submit recommendations for prioritizing road work.[41] The four holdover commissioners have full authority to decide the priorities for road and bridge work to be done out of their respective shops and with their budgets, subject only to ratification by the Commission for expenditures over $5,000.[42] When asked how he decides what roads and bridges to work on from month to month, Commissioner Burns responded: "By the need, the need that I feel like, and calls from the public." [43]

There was little or no practical change, therefore, between road and bridge practices before and after the entry of the 1986 consent decree. The holdover commissioners continued after the decree, as before, to defer to each other's spending decisions. After the decree, as before, the practice of the holdover commissioners was to defer to the personnel decisions of the other commissioners.[44] And after the decree, as before, each holdover commissioner decided whether to have work performed by his existing road crew or to send the work out for contract

---

36. Defendant's trial exhibit 4.

37. Defendant's trial exhibits 5, 8.

38. Billy Ray Williams deposition at 25.

39. Akins deposition at 54–55.

40. Transcript at 59 (testimony of McKee).

41. McKee deposition at 26–28; Ellison deposition at 71–73.

42. Akins deposition at 66; McKee deposition at 17–18.

43. Burns deposition at 21.

44. Transcript at 63 (testimony of McKee); Akins deposition at 60.

bidding.[45] Defendant's counsel stated at trial that there was no change in the percentage of the holdover commissioners' time—75%—spent on road and bridge work before and after the entry of the decree.[46]

Road and bridge work represents not only the vast majority of the work of the Commission in terms of time spent, but also represents the primary and most important function of county government that a commissioner may effectively use at his discretion for political purposes. A review of the county budget reveals that the bulk of non-road-and-bridge funds are dedicated to predetermined spending requirements or are controlled by other elected officials.[47] However, because the road and bridge funds are budgeted by district, they represent the primary means by which a commissioner can—if granted the authority—directly serve his district's residents, that is, those who elect him, as opposed to serving the county as a whole.

In sharp contrast, the duties assigned to the district 5 and 6 commissioners were, as stated, ministerial, county-wide, and essentially the kind that had been exercised by the chairperson. These duties did not permit the new commissioners to serve their districts in a meaningful way. The supervision of courthouse maintenance—which was originally assigned to the chairperson and, after the consent decree, reassigned to Commissioner Presley and later to Commissioner David Williams—is a position with little discretionary and substantive authority. The district 5 commissioner must maintain the courthouse and its grounds, and cannot use the funds or employees assigned to that purpose for any other purpose. Commissioner David Williams described the courthouse maintenance duties as follows:

"They have to cut the grass, they have to make sure the weeds are taken out of flower beds, make sure the floors are waxed, make sure the offices are cleaned, curtains are clean, blinds are hung, the heat is working properly in the jail. Whatever happens pertaining to the courthouse or the courthouse grounds, or the other county facilities, that's their primary duty." [48]

Commissioner David Williams further testified that, although he is taking his courthouse duties seriously, he wants to provide services to *his* constituents: "I want their roads paved," he said.[49]

The district 6 commissioner's supervision of the engineering department was equally, if not more, ministerial. Commissioner Billy Ray Williams testified that he has never done any supervision of the engineering department since he took office in 1986. He stated: "[T]o me that was just the bone, they give me a bone to run off over—because I really had no—I couldn't do really anything. I could say, well, yeah, I don't want you to work in this district or work in that district, but the county engineer's in charge of that ... really it was just a title." [50] The county engineer continued to do all hiring and firing in the engineering department; the county engineer testified that *his* personnel recommendations are normally adopted by the Commission.[51] Commissioner Billy Ray Williams ceased even his ministerial supervision of the engineering department in 1990 upon the passage of the 1990 substitute road supervision resolution. Although the provisions of that resolution were never implemented, Commissioner Billy Ray Williams interpreted it to supersede the 1987 road supervision resolution which originally assigned him the supervision of the engineering department.[52]

---

45. Ellison deposition at 29.

46. Transcript at 138. Although Chairperson Hitt testified that the percentage of time spent by the holdover commissioners on road and bridge work was 90%, not 75%, the significant point for present purposes is that there was no change in the percentage of time spent on road and bridge work before and after the consent decree.

47. *See generally* Akins deposition.

48. Transcript at 77.

49. David Williams deposition at 22.

50. Billy Ray Williams deposition at 10–11.

51. *Id.* at 11; Ellison deposition at 35–36.

52. Billy Ray Williams deposition at 10, 16–17. Although the 1987 road supervision resolution also assigned to the district 5 and 6 commissioners supervisory duties over the Etowah County Farmers Market, the record is unclear as to whether such supervision occurred. Assuming

Not having been cut a slice of the road-and-bridge-work pie, the district 5 and 6 commissioners and their respective constituencies were left at the mercy of the four holdover commissioners for the maintenance and construction of roads and bridges as well as the type of minor jobs done routinely by the four road shop crews. Certain of the holdover commissioners, particularly Commissioner McKee, completed some road and bridge work in districts 5 and 6.[53] However, any road and bridge work done in these districts was performed at the whim of Commissioner McKee and not in accordance with the wishes of the district 5 and 6 commissioners.

Commissioner Presley testified that he asked the other commissioners to repair a road drain that was running into one of his constituent's homes; none of the commissioners complied with his request, even though one looked at the problem and said he would take care of it.[54] Commissioner Billy Ray Williams testified that he feels unable to respond to the road and bridge needs of his constituents under the current arrangements.[55] He does not supervise the road workers when work is being done in his district; he testified that "they don't work for me, they have their own boss."[56] Commissioner Billy Ray Williams has had to do some of the work himself: "I had a weed eater that I did all of the—all of the small bridges and things in my district, I did that myself on a Saturday."[57] Commissioner David Williams's testimony reveals that any road work done by Commissioner McKee in his district is not subject to his control as the elected representative of that district:

"Commissioner McKee and I have had an on-again off-again conflict about the maintenance of my roads. There have been times that I told him that I didn't want

him in my district. There have been times that he told me that he would not do any work in any district.

"The latest discussion we had, I received some forms to sign for reimbursement from our county administrator. Some of those I did not authorize. I did not tell Mr. McKee to do those things. There have been other things that I have asked him to do such as bury some cows, fill some potholes. But I told him I would like to be notified as to what's going on pertaining to my roads, instead of him just going in there and doing something and then my being handed a reimbursement sheet to sign."[58]

After budgets were created for districts 5 and 6 in fiscal year 1992–93, any work done by one of the holdover commissioners in district 5 or district 6 is charged against that district's budget, regardless of whether the commissioner for that district requested or approved of the work done.[59]

## II. PROCEDURAL HISTORY

This lawsuit began on May 5, 1989, with the filing of a complaint by African–American residents of Etowah, Russell, and Escambia Counties challenging the policies and practices of their respective county commissions. Each of these county commissions had recently changed from at-large to single-member district election systems as a result of earlier consent decrees approved by this court. *Dillard v. Crenshaw County*, Civil Action No. 85–T–1332–N (M.D.Ala. Nov. 12, 1986); *Sumbry v. Russell County*, Civil Action No. 84–T–1386–E (M.D.Ala. Mar. 17, 1985).

On November 2, 1989, after the claims involving Escambia County were withdrawn, the court certified plaintiff classes of African–American residents of the two majority-

---

that it did, the court concludes that it was again a county-wide, ministerial function in a different class from the type of discretionary and substantive authority exercised over road and bridge work.

53. Transcript at 65 (testimony of McKee); McKee deposition at 38; Burns deposition at 19.

54. Presley deposition at 24–25.

55. Billy Ray Williams deposition at 29.

56. *Id.* at 31.

57. *Id.* at 32.

58. Transcript at 75.

59. David Williams deposition at 13; transcript at 75 (testimony of David Williams).

black districts in Russell County and the one majority-black district in Etowah County. The court then allowed plaintiffs to amend their complaints against both counties to contend that allegedly discriminatory county commission policies constituted changes with respect to voting that could not be implemented prior to preclearance under § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c (West 1994).[60] The Etowah County plaintiffs challenged the implementation of the 1987 road supervision and common fund resolutions without preclearance; and the Russell County plaintiffs challenged the implementation of a 1979 unit system resolution which delegated control over road work to the county engineer. Because § 5 challenges must be decided by a three-judge court, *Allen v. State Bd. of Elections*, 393 U.S. 544, 560–63, 89 S.Ct. 817, 829–30, 22 L.Ed.2d 1 (1969), this single-judge court deferred further proceedings on plaintiffs' other claims until the § 5 issues were resolved.

On August 1, 1990, the three-judge court ruled that Etowah County's road supervision resolution required § 5 preclearance and enjoined the Etowah County Commission from enforcing this resolution without first obtaining preclearance. The court found the resolution to "effect a significant relative change in the powers exercised by governmental officials elected by, or responsible to, substantially different constituencies of voters." Order of August 1, 1990, at 19. The court further held that Etowah County's common fund resolution and Russell County's unit system resolution were not changes in voting requiring § 5 preclearance. The court found that neither of these resolutions effected a shift in authority between officials with different constituencies—distinguishing them from the road supervision resolution—and

concluded that preclearance was not required.

Plaintiffs appealed directly to the Supreme Court the three-judge court's ruling that neither the Russell County Commission's unit system resolution nor the Etowah County Commission's common fund resolution was covered under § 5. The Etowah County Commission, however, did not appeal the court's ruling that its road supervision resolution was subject to § 5 preclearance. Although the Supreme Court affirmed the three-judge court's holding that the unit system resolution and common fund resolution did not require preclearance, the Court rejected the lower court's interpretation of § 5. *Presley v. Etowah County Comm'n*, 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992). Specifically, the Supreme Court rejected the lower court's assumption that "transfers of power among governmental officials could be changes with respect to voting" under § 5. *Id.* at 507, 112 S.Ct. at 831. The Court held that "[c]hanges which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506, 112 S.Ct. at 830.

The Etowah County plaintiffs then filed a motion for additional relief seeking enforcement of the three-judge court's injunction against the implementation of the 1987 road supervision resolution and a motion for a preliminary injunction pending disposition of their motion for additional relief.[61] The three-judge court denied both motions—in light of the § 5 principles announced by the Supreme Court in *Presley* which undercut the three-judge court's rationale for holding that the road supervision resolution was covered under § 5—and lifted its injunction against implementation of the 1987 road supervision resolution. *Mack v. Russell Coun-*

---

60. Section 5 of the Voting Rights Act requires that states and local governments subject to the section's coverage obtain federal approval before they may implement any change in a "standard, practice, or procedure with respect to voting." 42 U.S.C.A. § 1973c (West 1994). A covered jurisdiction may obtain preclearance either by securing a determination from the District Court for the District of Columbia that the change "does not have the purpose and will not have the

effect of denying or abridging the right to vote on account of race or color" or by submitting the change to the Attorney General of the United States for approval. *Id.*

61. The remaining claims of the Russell County plaintiffs were subsequently resolved by consent decree and are no longer before this single-judge court. Order of July 8, 1993.

*ty Comm'n,* 840 F.Supp. 869 (M.D.Ala.1993) (three-judge court) (per curiam).

Neither the Supreme Court nor the three-judge court has addressed any of plaintiffs' contentions beyond the issue of § 5 coverage. Both courts disavowed any view concerning the merits of the claims left for ruling by the single-judge court. The Supreme Court stated: "Nothing we say implies that the conduct at issue in these cases is not actionable under a different remedial scheme." *Presley,* 502 U.S. at 509, 112 S.Ct. at 832. The three-judge court wrote: "Nothing in our decision today precludes plaintiffs from maintaining their claims under § 2 ... and related claims under other constitutional and statutory provisions against the Etowah County Commission. We in no way prejudge or suggest any view as to the merits of those claims." *Mack,* 840 F.Supp. at 871 n. 1.

By order of November 2, 1989, the court had certified Lawrence Presley as the representative of a class of all African–American citizens of district 5 of Etowah County. After Presley died, the three-judge court, by order of December 21, 1993, granted the petition of Alice Bruce Presley, Gladys A. Barnes, Floyd Donald, Walt Higgins, Daniel Littlefield, Joyce Cowser Riggins, and David L. Williams to intervene as plaintiffs. By order of January 4, 1994, this single-judge court certified these plaintiffs as representatives of the class formerly represented by Lawrence Presley.

## III. DISCUSSION OF PLAINTIFFS' CLAIMS

These plaintiffs, on behalf of themselves and the class they represent, now present the following legal claims to this single-judge court. First, plaintiffs claim that the Etowah County Commission's road supervision and common fund resolutions and its present road and bridge practices violated ¶ 3 of the 1986 consent decree. Second, plaintiffs claim that these resolutions and practices violated Title VI of the Civil Rights Act of 1964 and the fourteenth and fifteenth amendments to the United States Constitution, which prohibit intentionally racially discriminatory action by government officials. Plaintiffs allege that such invidious intent is evidenced in two

ways: (1) the actions of the white members of the Etowah County Commission were motivated by racial bias; and (2) the practices of the Commission unconstitutionally perpetuate the historical intentional discrimination embodied in the official regime of racial segregation and white supremacy maintained by the State of Alabama and Etowah County. Finally, plaintiffs allege that the road and bridge resolutions and practices violated § 2 of the Voting Rights Act because they have the intent of or result in diluting black voting strength.

### A. *Violation of the 1986 Consent Decree*

█ The court turns first to plaintiffs' claim that the Commission has violated ¶ 3 of the 1986 consent decree by not providing the district 5 commissioner with an equal share of road and bridge authority. In considering plaintiffs' claim, the court is mindful that a consent decree is a judgment and its construction is a question of law for the court. *Paradise v. Prescott,* 767 F.2d 1514, 1525 (11th Cir.1985) (per curiam), *aff'd on other grounds,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). Nevertheless, because a consent decree "also has many attributes of a contract between the parties," it should be construed in light of the traditional tenets of contract construction, with the "scope of [the] decree ... discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* (quoting *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971)); *see also United States v. I.T.T. Continental Baking Co.,* 420 U.S. 223, 233–38, 95 S.Ct. 926, 933–35, 43 L.Ed.2d 148 (1975); *Jacksonville Branch, NAACP v. Duval County School Bd.,* 978 F.2d 1574, 1578 (11th Cir.1992). When language in a consent decree is ambiguous, courts may consider extrinsic evidence. *Brewer v. Muscle Shoals Bd. of Educ.,* 790 F.2d 1515, 1519 (11th Cir. 1986).

### 1.

Paragraph 3 of the 1986 consent decree has two components. First, the district 5 and 6 commissioners must have "all the rights, privileges, duties and immunities of

the other commissioners, who have heretofore been elected at-large." And second, the first component is to remain in effect "until their successors take office." The court will address the second component first. The parties agreed at trial that the phrase "until their successors take office" was intended to guarantee an equal sharing of powers until 1990 when the four holdover commissioners and the two new commissioners all were elected from single-member districts.[62] No one argued that the phrase applied to the chairperson and thus that the duration of the guarantee was until 1993 when his office was to be phased out; the chairperson had no "successor" take office. However, because the pivotal issue in determining whether ¶ 3 has been violated is whether the Commission ever afforded the district 5 commissioner all the rights and privileges of the other commissioners, the temporal nature of ¶ 3 is not relevant at this time.[63]

2.

The court turns next to the first component of ¶ 3, which dictates that the district 5 commissioner, upon assuming office, be granted "all the rights, privileges, duties and immunities of the other commissioners, who have heretofore been elected at-large." The court concludes that the Commission has openly and indisputably violated this express language. The court reaches this conclusion whether it restricts itself to the four corners of the decree or considers extrinsic evidence.

The court initially finds—assuming logically that both the first and second components of ¶ 3 must be read consistently—that the reference to "other commissioners" in the first component is to the "four holdover commissioners" and not the chairperson. Accordingly, the important question for the court is what were the rights and privileges of the holdover commissioners at the time of the 1986 consent decree. Both before and after the entry of the 1986 decree, Etowah County's commissioners spent between 75 and 90% of their time on road and bridge

work; they were appropriately known as "road commissioners." However, the evidence is overwhelming that the district 5 commissioner has never been granted the same authority as the holdover commissioners enjoyed over road and bridge work both before and after the decree. The Commission has continued to operate as it did when four commissioners were elected under the discriminatory, at-large system. Post–1986 resolutions and practices cut the district 5 commissioner out of the road-and-bridge-work pie, thereby denying him equal access to and independent responsibility for road and bridge funds and supervision and thus the only means of effectively serving his electorate.

The Commission instead assigned to the district 5 commissioner essentially those ministerial and county-wide duties that had been previously exercised by the chairperson—in particular, management of the courthouse and grounds. This was not what ¶ 3 required, however. Indeed, such a reading of the paragraph would be nonsensical because the district 5 commissioner, unlike the chairperson, was not a county-wide official. Instead, ¶ 3 logically required that the district 5 commissioner would share equally those rights and privileges that were enjoyed by the holdover commissioners who, like the district 5 commissioner, were each primarily beholden to the residents of their districts.

To be sure, it may be necessary that county-wide duties be assumed by someone. It was, however, improper to assign all of them to the district 5 and 6 commissioners to the exclusion of the road and bridge work assigned to the holdover commissioners. Under the decree, the new commissioners were not just to share equally in "some" of the privileges and rights of the holdover commissioners; the decree was explicit that they were to share equally in "all" of them. As stated, before and after entry of the 1986 consent decree, the holdover commissioners spent 75 to 90% of their time on road and

---

62. Transcript at 140–41.

63. This is not a situation where, for example, ¶ 3 had been complied with for several years and the determination for the court was whether compliance endured throughout the entire period.

Here, there was no compliance from the very beginning. However, the temporal nature of ¶ 3, as will be discussed below, is relevant in the determination of a remedy.

bridge work and they were tellingly known as road commissioners. Any reading of the term "all" not to include an equal share of road and bridge responsibilities would be untenable. This conclusion is reinforced by the testimony of Jerome Gray. Gray testified that the negotiators of the 1986 decree were aware that the commissioners had executive control over road shops and that they did not envision switching to a unit system as a means of complying with the decree. Instead, according to Gray, the purpose of ¶ 3 was to ensure that the new district 5 and 6 commissioners were granted equal access to and independent responsibility for road and bridge funds and supervision. The Commission offered no evidence to dispute Gray's testimony regarding the parties' understanding of ¶ 3. However, despite this uncontradicted evidence of intent, the Commission has not given the district 5 commissioner an equal share of the authority over road and bridge work.

The Commission, nevertheless, raises a number of arguments to support its contention that it complied with ¶ 3. First, the Commission argues that it was in compliance because it granted "equivalent," if not identical, powers to the district 5 and 6 commissioners. The court must reject this interpretation of ¶ 3. As discussed above, the paragraph required that the holdover commissioners' road and bridge authority, not the chairperson's county-wide authority, be shared with the two new commissioners. In addition, the paragraph required that "all" the rights and privileges of the holdover commissioners over road and bridge work be shared, not merely a roughly equivalent division.

Moreover, even were the court to construe ¶ 3 to authorize granting equivalent powers, the court finds that the powers granted the district 5 commissioner—supervision of courthouse maintenance and so forth—were ministerial non-discretionary functions that are in no way equivalent to the road and bridge authority exercised by the holdover commissioners either before or after the 1986 decree. The court can, as a general matter, conceive of a system whereby county com-

missioners each have different powers but can each serve their constituents equally well. The distribution of powers on the Etowah County Commission since 1986, however, is not such a system. The district 5 commissioner was entitled under the 1986 consent decree to assume the substantive duties of a road commissioner.

Second, the Commission argues that the district 5 commissioner was granted all the rights and privileges of the other commissioners—even with respect to road and bridge work—because, as a member of the Commission, he had the right to "attend all commission meetings, vote on all resolutions, vote on all budgetary matters, both road and bridge and general fund." [64] In furtherance of this argument, the Commission asserts that road and bridge work was done in district 5 by one of the four road shops. The court must reject this argument as well. As to the fact that the district 5 commissioner voted on all matters, including those involving road and bridge work, ¶ 3 did not merely require that he be granted the right to vote—forever in the minority—on whether he *should* be granted all the substantive rights the holdover commissioners had enjoyed before the decree. Indeed, if this were all that ¶ 3 required, the provision would be meaningless and superfluous. The provision instead required that all these rights *actually* be granted to him.

As to the contention that the Commission complied with ¶ 3 by having one of the four road shops perform road and bridge work in district 5—even assuming the factual basis to be true—the court must reject this interpretation of ¶ 3. The purpose of ¶ 3—which was included as a remedy for a *voting* rights violation, not as a remedy for the discriminatory provision of county services—was to guarantee that the district 5 commissioner, on behalf of his constituents, could exercise effective political control over road and bridge work and the resources necessary to accomplish that work. Paragraph 3 did not merely require that potholes in district 5 be filled, but that the elected representative of that district have control over the resources

---

**64.** Defendant's trial brief at 23.

to fix the potholes, supervision of the workers who fix the potholes, and the discretion to decide which potholes to fix and when. Commissioner McKee himself, when asked whether he thought that the 1986 decree was about paving roads or about the political power to decide which roads get paved, answered: "Political power I guess to see who decided."[65] Commissioner David Williams also recognizes that the heart of the Commission's violation of ¶ 3 is not that his roads are not getting paved, but that he is cut out of the political process. When asked how he would respond if there were more pressing needs in another district, he stated: "Then they're welcome to those funds. Maybe we can trade off some things, use the barter system a little bit. At least I would have some bargaining power, at least I would have to be considered."[66] In any event, the factual basis for the Commission's contention is not true. The court finds from the evidence that the commissioners from district 1 through 4 have far from adequately addressed the road and bridge needs of district 5.

The Commission further argues that its unequal allocation of road and bridge authority is justified for two practical reasons. First, the Commission contends that the allocation is justified because districts 5 and 6 have substantially fewer county road miles than districts 1 through 4, and more municipal road miles, and that the county's road and bridge funds are not to be used on municipal roads. Second, the Commission contends that, in any case, the municipal roads are well maintained by the incorporated municipalities and not in need of the county's support in addition to gasoline tax funds already earmarked for municipal use. Even assuming that there is a factual basis for these two contentions, they fail because

¶ 3 does not allow for such unequal distribution of road and bridge authority. As stated, the paragraph provides that the commissioners from districts 5 and 6 are to enjoy "all" the rights and privileges of the holdover commissioners—that is, they are to share equally in the authority over road and bridge work. There is nothing in ¶ 3 that allows for anything less based on mileage or on whether the roads and bridges are county or municipal.

Moreover, there is no factual basis for the two contentions. As to the first contention regarding disparities in mileage, the Commission is correct that districts 5 and 6 have fewer county road miles. Districts 1 through 4 each have between approximately 142 and 266 miles of county roads; districts 5 and 6 have only 5.6 and 35.2 miles, respectively.[67] The Commission is also correct that certain funds are earmarked "off the top" of revenues from the county's allocation of gasoline taxes: 17% of those gasoline taxes are divided among incorporated municipalities in Etowah County.[68] Under state law, an additional 10% of gasoline taxes are allocated to all municipalities in proportion to their populations.[69]

The total distribution of 27% of gasoline taxes to the incorporated municipalities within Etowah County is not, however, meant to eliminate the responsibility of Etowah County for those of its roads that are also located within an incorporated municipality. This is true as a matter of law, as a matter of practice, and as a matter of arithmetic. First, there is no state or county law precluding the use of county road funds on roads within municipalities.[70] Second, members of the Commission have historically performed road work within the county's municipalities. Commissioner McKee has done work within

---

**65.** Transcript at 73.

**66.** David Williams deposition at 19.

**67.** Affidavit of Roger Ellison, ¶ 3 (defendant's trial exhibit 3). The disparity is similar when unpaved roads are considered: districts 1 through 4 each have between approximately 12 and 37 miles of unpaved county roads; districts 5 and 6 have 2.1 and 1.3 miles of unpaved county roads, respectively. *Id.* at ¶ 4.

**68.** Transcript at 96 (testimony of Akins).

**69.** *Id.* at 109; 1975 Ala.Code §§ 40–17–74, 40–17–223 (1993).

**70.** Transcript at 73 (testimony of McKee), 80 (testimony of David Williams), 115 (testimony of Akins).

the City of Gadsden.[71] Commissioner Burns testified that, when requested to do so, he works on municipal streets. Burns stated that, although the municipalities receive a portion of the gasoline taxes, "those people in those incorporated areas, they're voters, too.... And taxpayers."[72] One of the municipalities located in district 3 contracts with the district 3 road shop to have maintenance work done on its roads.[73] Commissioner David Williams described the holdover commissioners' practice of doing road work in municipalities: "They do work in their cities, they do work at the schools. Now, why should they have money to do that and I can't have money to do that."[74] Third, although incorporated municipalities in Etowah County receive 27% of gasoline taxes, these funds are disproportionate to the number of the county's residents located in those municipalities. For example, on the basis of its size in comparison to other Etowah County municipalities, Gadsden receives 56% of the total pool of 27% of gasoline taxes. Gadsden thus receives approximately 15% of the entire County's gasoline taxes. Gadsden, however, contains 44% of the county's residents. Thus, although Etowah County provides some funding for the municipalities to maintain their own roads, this funding, in and of itself, is inadequate to relieve the county of its duty to maintain the roads of its incorporated municipalities, the residents of which pay gasoline taxes just as county residents do.[75]

Therefore, the Commission's justification that it has truly divided road funds "equally" based on county road mileage in each district is belied by the facts. County commissioners can, do, and should use their road budgets to maintain all of the roads within their districts, including municipal roads. Moreover, the Commission's justification fails for an independent reason: a review of its road budget reveals that the allocation of road funds is not, in fact, explainable on the basis of the number of county road miles in each district. David Akins, the county executive, testified that the county was not dividing up road funds on the basis of mileage.[76]

The Commission's second justification for its unequal distribution of road funds is that more money must be spent in districts 1 through 4 because the county roads are more in need of paving and repair than municipal roads.[77] However, it does not appear that funds are distributed solely based on unpaved road mileage.[78] While the Commission has offered evidence to show that county roads are in need of work, so too have the plaintiffs shown that the municipal roads are in need of work. Robert Avery, a Gadsden city council member whose district falls within Etowah County district 5, testified that there are several miles of unpaved road in his district alone.[79] He further testified that Commissioner David Williams asked him to seek funds from the Gadsden city council to pave a portion of a road within both Gadsden and district 5; Avery attempted to secure such funds but Gadsden only has funds for resurfacing, not base paving.[80] Neither of the Commission's justifications for its unequal distribution of road and bridge resources, therefore, survives the court's factual findings to the contrary.

3.

■ The court must further reject the Commission's argument that the court ex-

71. *Id.* at 67 (testimony of McKee).

72. Burns deposition at 24–25.

73. Akins deposition at 49.

74. David Williams deposition at 28; *see also* transcript at 80 (testimony of David Williams).

75. Transcript at 110. Any funds raised by Gadsden—by taxing its residents—which Gadsden chooses to spend on its roads should not be counted against the county's responsibility to maintain all of the roads within its borders because Gadsden residents are, in essence, paying twice.

76. Transcript at 112 (testimony of Akins).

77. *Id.* at 118–121 (testimony of Ellison). *But see id.* at 66 (testimony of McKee) (roads in districts 2 and 5 in same shape except more unpaved roads in district 2).

78. Defendant's trial exhibit 4.

79. Transcript at 135.

80. *Id.* at 136.

ceeded its authority under § 2 of the Voting Rights Act in approving ¶ 3. The Commission agreed to all provisions of the 1986 consent decree of its own volition; the court only considered the decree after it had been signed by counsel for Etowah County. Moreover, the Commission has not sought modification of or relief from the decree. Modification of a consent decree, like modification of any judgment or order, is formally governed by Rule 60(b) of the Federal Rules of Civil Procedure. In *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court announced a flexible two-part standard for determining when modification is appropriate under Rule 60(b). First, the party seeking modification of the decree must show "a significant change in factual conditions or in law" that warrants modifying the decree. *Id.* at 384, 112 S.Ct. at 760. Second, if the moving party meets this burden, the court then considers "whether the proposed modification is suitably tailored to the changed circumstances." *Id.* If the Commission believed that ¶ 3 was no longer valid because of a change of law or factual conditions, the appropriate course would have been to seek modification, not to proceed to violate the decree based only on its opinion that a portion of that decree was invalid.

▮ The court also rejects any contention by the Commission that ¶ 3 is violative of § 2 of the Voting Rights Act as a matter of law. The failure to comply with ¶ 3—that is, divide powers equally—may or may not itself violate § 2. It does not follow, however, that a consent decree that requires an equal division of powers for a limited period of time as a remedy for a § 2 violation is itself violative of § 2. *See Dillard v. Crenshaw County,* 831 F.2d 246 (11th Cir.1987) (discussing relief of rotating chair without finding § 2 violation).

### 4.

The court concludes, therefore, that the Commission has violated ¶ 3 of the 1986 con-

sent decree by not granting the district 5 commissioner an equal share of authority over road and bridge work in Etowah County. Plaintiffs have convinced the court that they are entitled to relief sufficient to cure the Commission's failure to comply with ¶ 3 at any time since 1986.

### B. Other Claims

Plaintiffs also seek relief under the fourteenth and fifteenth amendments, § 2 of the Voting Rights Act of 1965, and Title VI of the Civil Rights Act of 1964. At this point in time, however, it is unclear that relief under these statutory and constitutional claims would exceed relief accorded for violation of the 1986 consent decree. The court cannot find on the record before it that any additional relief would be available under the statutory or constitutional claims and it is possible that the relief available for violation of the decree—both as to substance and duration—is equal to that available for all of the claims. The court, therefore, need not reach, and expressly reserves ruling on, plaintiffs' constitutional, § 2, and Title VI claims.[81] Depending on future events, the court may have to reach these issues at a later time.

### IV. REMEDY

As a remedy for the Commission's violation of the 1986 consent decree, plaintiffs are entitled to that which they bargained for: an equal division of *all* powers previously and currently exercised by Etowah County commissioners, especially including all powers involving road and bridge work—be they supervisory, budgetary, or otherwise—for a period of time. However, the court does not believe that it should attempt to fashion or select the appropriate relief at this time.

It appears that there are a number of possible remedies, the most obvious first one being the creation of two new road shops. Plaintiffs suggest that each commissioner should exercise independent authority over

---

**81.** The court has an additional basis for declining to rule on plaintiffs' constitutional claims at this time. As the court has previously recognized: "Prudent jurisdictional principles counsel that a court should normally 'not decide a constitutional question if there is some other ground upon

which to dispose of the case.'" *Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1352 n. 1 (M.D.Ala.1986) (Thompson, J.) (quoting *Escambia County v. McMillan,* 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984)).

one-sixth of the county's road shops and resources for an indefinite period. In addition, the court could conceive of an arrangement in which the commissioners from districts 5 and 6 would enjoy independent and uninterrupted authority over two of the road shops—as that authority is and was exercised by the commissioners from districts 1 through 4—and in which the authority over the other two road shops would be rotated among the other four commissioners, with the arrangement to remain in effect until all commissioners will have served an equal amount of time as "road commissioners," beginning from the date of the 1986 consent decree. The court cannot determine on the current record which, if any, of these alternatives would be appropriate. For example, it may or may not be feasible and efficient to create two additional road shops. Moreover, the Commission has yet to comment on the issue of relief. Because this case is, at its core, one of local politics, the court should solicit from the parties, and particularly the Commission, input on how the Commission should restructure its operations, such that the district 5 commissioner can now take his rightful place at the table of road and bridge authority. The court will therefore solicit additional input from the parties on two remedial issues in light of the factual findings and conclusions of law entered today.

First, the court will require the parties to develop and submit jointly—but separately if they cannot agree—a remedial scheme consistent with both the need to provide a complete remedy for the Commission's violation and the practical circumstances of Etowah County's existing operations. The court will note, however, for the reasons already given, that a switch to the unit system would not be an appropriate remedy. Although each commissioner would theoretically share equally in a unit system, such a system would not give to the district 5 commissioner the access to and independent authority over road and bridge work that the commissioners from districts 1 through 4 have enjoyed both before and after the consent decree. Commissioner David Williams explained why:

"[T]he county engineer works at the leisure of the commission. If he does what is unfavorable to the majority of the commissioners, then he's also exposing himself to the potential wrath of those commissioners.

"I'm only one voice. And if I'm only one voice, then they can outvote me and do whatever they want to when we're talking about prioritizing roads." [82]

Moreover, in adopting ¶ 3, the parties expressly rejected the unit system. [83]

Second, the court will seek input as to the duration of any court-ordered relief, to be submitted along with the parties' proposed remedial scheme. The initial hope of ¶ 3 presumably was that, after four years, there would be a culture of cooperation and fairness on the Commission such that the paragraph's fairly rigid requirement of equal sharing of all duties would no longer be necessary. Because of the Commission's violation of the paragraph, however, there has never been an equitable starting place. Therefore, a period longer than four years may be necessary, first, to achieve the hoped-for culture of cooperation and fairness given the years of resistance by the Commission and what appear to the court to be sour relations among the present commissioners, and, second, to redress the inequity that, for approximately eight years, the commissioners from districts 1 through 4 have enjoyed continued control over road and bridge work to the exclusion of the district 5 commissioner and in violation of his rights and the rights of his constituents under the consent decree.

The court is optimistic that the parties to this lawsuit can work together to propose a remedial scheme to the court that will allow the Etowah County Commission to reach a point where its prior history of racial discrimination and its past and present failure to comply fully with the 1986 decree will no longer poison its distribution of powers and its political culture. The residents of Etowah County—in every district—deserve nothing less.

---

82. Transcript at 81.

83. Interestingly, all commissioners still appear to be opposed to a unit system. *See, e.g.,* Burns deposition at 26.

## V. CONCLUSION

Finally, although the court has not had to reach plaintiffs' claim under § 2 of the Voting Rights Act, the facts of this case compel some general comments about the claim. The following testimony of Commissioner David Williams poignantly and succinctly describes how, as a result of the actions of the four holdover commissioners after entry of the consent decree, the initial victory back in 1986 was essentially rendered a hollow one:

"Q: What have you been able to do ... specifically for the constituents that you represent in District 5?

"A: Nothing. Very little. It is taken me one year to get a tree cut down.... I'm not able to get specifications for bids so that I can bid those things out. I have tried to work with the other municipalities in getting my roads included on their pavement projects, and told them that I would reimburse them, to no avail.

"Currently, the City of Attalla mayor is maintaining the roads in my district there. So I'm able to do very little. When you don't have the resources, the finances, the manpower, the equipment, I'm not able to do much at all.

"Q: Well, what say do you have over the manpower and the equipment in the road—the four road shops in Etowah County?

"A: Little or no say. As it was stated previously, it's more of a rubber stamp thing. They say who they want, they go through the proper procedures, according to the personnel policy and then they hire that individual. They buy what they want to buy, they don't ask me, 'Can I buy this?'....

"Q: Would you tell the court how you would carry out your job, your duties if you had a fair share of the road and bridge budget under your control, a fair share of the equipment and a fair share of the crews?

"A: Well, I would be able to address the needs of citizens of my district without having to go to other municipalities, without having to go or wait for the time that some other commissioner can address those needs of my citizens. It wouldn't take a year to cut down a tree that's blocking a stream that's causing the further erosion of the property lines of a citizen in my district.

"I would like to hire individuals in my district, in my district shop that would more likely reflect the demographics of Etowah County, and I would just like an opportunity to be able to address those needs the same way any other commissioner, they're able to address the needs of their citizens." [84]

Indeed, it could be reasonably debated whether, because of the holdover commissioners' actions, the residents of district 5 are even worse off than they were before entry of the consent decree. Fortunately for these residents, however, those who negotiated the 1986 consent decree had the prescience to include ¶ 3 in the decree.

In other cases, however, where there is no consent decree to protect representatives and residents of newly created black-majority districts from actions similar to those taken by the holdover commissioners against the district 5 commissioner, the path to redress is not so certain. In light of the Supreme Court's decision in *Presley*, it is unclear whether § 2 provides relief under facts such as those presented in this case, either directly as a self-standing claim under § 2 or indirectly as incident to a separate § 2 claim or both. The facts of this case cry out, however, that § 2 should.

An appropriate judgment and injunction will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that:

(1) It is DECLARED that defendant Etowah County Commission has violated ¶ 3 of the consent decree entered on November 12, 1986, in *Dillard v. Crenshaw County*, Civil

**84.** Transcript at 78–80.

Action No. 85–T–1332–N (M.D.Ala. Nov. 12, 1986);

(2) Defendant Etowah County Commission, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are each RESTRAINED and ENJOINED from failing to comply with ¶ 3 of said consent decree and from failing to put in place a remedial scheme in which the district 5 commissioner shares fully in "all rights, privileges, duties and immunities" enjoyed by the district 1, 2, 3, and 4 commissioners before and after said consent decree, especially including all functions relating to road and bridge operations in Etowah County, Alabama;

(3) By December 20, 1994, plaintiffs and defendant Etowah County Commission are jointly to develop and submit to the court, and separately if they cannot agree, the following:

(A) A proposed remedial scheme by which the district 5 commissioner can share fully in "all rights, privileges, duties and immunities" enjoyed by the district 1, 2, 3, and 4 commissioners before and after said consent decree, especially including all functions relating to road and bridge operations in Etowah County, Alabama; and

(B) A proposed term of duration for said remedial scheme; and

(4) Plaintiffs have and recover from defendant Etowah County Commission their reasonable attorney's fees and expenses, and that plaintiffs are allowed until January 3, 1995, to file their request for attorney's fees and expenses.

The clerk of the court is DIRECTED to issue a writ of injunction.

It is further ORDERED that costs are taxed against defendant Etowah County Commission, for which execution may issue.